GUNSCH et al.   v.   GUNSCH et al.

No. 7438.

Supreme Court of North Dakota.

Aug. 4, 1954.

Rehearing Denied Dec. 17, 1954.

J. K. Murray, Bismarck, for appellants.
Tony Gunsch in pro. per.

Floyd B. Sperry, Golden Valley, for respondents, Leona Gunsch, Fred Bauer and Arthur Bieber.

W. J. Austin, Bismarck, for respondent, David Gunsch.

C. E. Brace, Asst. Atty. Gen., for respondent, John O. Lyngstad, Commissioner of the Board of University and School Lands for the State of North Dakota.

JOHNSON, Judge.

This is an action to determine adverse claims to the following real property: S½ and the NE¼ Section 13, and the S½SE¼, S½SW¼ Section 12, 143–89, hereinafter designated as the "section," and the NE¼ Section 14, Township 143, North, Range 89, West, hereinafter designated as the "State land"; and also requesting performance of an alleged contract for the purchase of said real property and also of the following personal property, by the plaintiffs from Tony Gunsch, one of the defendants, to wit: 1 1950 Massey-Harris self-propelled combine, model 27–14 foot; 1 1950 four-bottom Case plow; 1 1950 four-bottom press drill; 1 1946 model "U" Minneapolis tractor; 15 cows and one bull; or for the recovery of money alleged to have been invested by the plaintiffs as a result of the negotiations between them and the defendant Tony Gunsch. The plaintiffs claim to be the equitable owners of the property. No objection was made by any of the defendants to the form of the action. This is one of six actions arising out of the same state of facts. All the cases were consolidated for the purpose of trial.

David Gunsch, one of the defendants, is the father of Dan and John Gunsch, the plaintiffs in the action, and also of the defendant, Tony Gunsch. On February 19, 1951, David Gunsch entered into a contract for deed with his son Tony Gunsch for the sale of the "section." The purchase price stated in the contract was $16,000 payable by delivery of two-thirds of the crop raised each year on the land to David Gunsch. The price of the grain delivered was to be fixed on or before the 15th day of Novem-

ber each year. The amount realized was to be credited on the contract, first on interest due and the balance on principal. Leona Gunsch was the wife of Tony Gunsch. She left Tony Gunsch on the day that he entered into this contract with his father, David Gunsch. The contract is not signed by her. At the same time that Tony Gunsch entered into this contract with his father he signed a $16,000 note payable to David Gunsch with interest at four per cent per annum payable annually according to the conditions of the contract. The contract provided, "It is further agreed and understood that no assignment of the premises or any part thereof, or of said contract, or pledge thereof, shall be valid unless the consent of the party of the first part shall be endorsed thereon or permanently attached thereto."

Prior to the sale of the "section" to Tony Gunsch, on June 3, 1950, David Gunsch and his wife had made, executed and delivered a mineral deed to an undivided one-half interest of the minerals in the "section." This mineral deed was recorded on the 15th day of June, 1950, in Book 40 of Deeds at page 235, Mercer County, North Dakota. On the same date David Gunsch and his wife entered into an oil and gas lease covering the "section" and which was recorded in the office of the Register of Deeds, Mercer County, on the 15th day of June, 1950, in Book 23, Miscellaneous, page 395. The lease and the mineral deed have been assigned to persons that are not parties to this action. At the time that Tony Gunsch entered into the contract for deed with his father, David Gunsch, for the purchase of the "section" he was not aware of the execution and delivery of the mineral deed and the gas and oil lease given by his father and mother on the "section."

At the time of the execution and delivery of the contract for deed Tony Gunsch made, executed and delivered a chattel mortgage for $4,000 and due November 15, 1951. This mortgage described farm machinery and 26 head of cattle. It recites: "It is understood and agreed between the parties hereto that this Chattel Mortgage is given as additional security to a Land Sale Contract, dated this date, in the sum of $16,000,

between the Parties hereto (covering the "section") * * * and that this chattel mortgage will be released of record and satisfied from the first money received on said contract up to and including the sum of $4,000 and interest." Prior to the purchase of the "section" from David Gunsch by Tony Gunsch, on November 4, 1949, he had purchased under contract for sale of land, the NE¼ of Section 14, Township 143, North, Range 89, West, Mercer County, North Dakota, from the Board of University and School Lands, State of North Dakota, for the sum of $3,750 paying at the time twenty per cent of the purchase price or $750; the balance of the purchase price was to be paid in equal annual payments, the annual payment to be six per cent of the original purchase price. An amount equal to four per cent of the unpaid principal was to be credited to interest and the balance applied on principal. The contract of sale is dated December 14, 1949. It recites: "It is further agreed that, neither this contract nor any interest of the vendee in said premises by virtue of this contract shall be assignable by the said vendee without the written consent of said vendor, and no assignment shall bind the vendee, unless and until such assignment or a duplicate or certified copy thereof is filed with said Commissioner and the assignment duly approved by the Board of University and School Lands."

About the 10th day of March, 1951, Leona Gunsch instituted an action for divorce against her husband, Tony Gunsch, and at the same time there was issued out of the District Court of the Sixth Judicial District a temporary restraining order and an order to show cause directed to the defendant, Tony Gunsch. This order was set for hearing on the 20th day of March, 1951, at Mandan, North Dakota. Insofar as is applicable it restrained and enjoined the defendant Tony Gunsch from "secreting, transferring, disposing, or encumbering any of your property, either real or personal, until the foregoing Motion can be heard and disposed of, or until the further Order of the Court." This temporary restraining order and order to show cause was served upon the defendant personally on the 13th day of March, 1951, together with copies of the summons, complaint, affidavit and application, motion and temporary restraining order. The hearing on the motion was continued from the 20th day of March, 1951, to the 5th day of April, 1951. The plaintiff and defendant both appeared by counsel on said date and the court upon the motion, insofar as pertinent to this action, ordered Tony Gunsch, the defendant, "enjoined and restrained from secreting, transferring, disposing of, or encumbering any of your real property, or personal property, excepting farm machinery, and cattle or increase therefrom, said cattle excepted from this Restraining Order to be sold only for the purpose of making payments heretofore provided for in this Order, all of which shall continue pending the trial of this action, and until the further Order of this Court." This order is dated April 7, 1951, and signed by the Honorable L. C. Broderick.

On the 15th day of March, 1951, the plaintiffs assert that by oral negotiations they purchased all of the interest of Tony Gunsch in the "section" and in the "State land," and also the farm machinery described and sixteen head of cattle. They assert that they agreed to pay $7,000 for all of the property; that as a part of this alleged purchase price for the Tony Gunsch interest in the land, the machinery and the cattle, they were to pay a debt of $2,000 to David Gunsch, their father, due him from Tony, which was to be deducted from the $7,000. It is further asserted that the father David Gunsch consented to the sale of Tony's interest in the "section."

The divorce action of Leona Gunsch v. Tony Gunsch was tried on the 25th day of June and resulted in a judgment on the 28th day of June, 1952. Under the judgment the court decreed to the plaintiff, Leona Gunsch, as her absolute property the "section" purchased by Tony Gunsch from his father David Gunsch subject to the amount owing on the contract. In addition to awarding Leona Gunsch the interest of Tony Gunsch in the contract with his father involving the "section," she was

awarded as her share of the property 1,400 bushels of wheat in the Peavey Elevator Company subject to certain garnishments against the same in the amount of $1,194; cash in the Bank at Beulah in the amount of $739.71; 13 head of cows; one-half interest in eleven calves and one bull, and the household goods and furniture in her possession or in the dwelling house upon the land described as the "section." To the defendant, Tony Gunsch, the court awarded and decreed as his share of the property, the contract for the purchase of the "State land" together with the following machinery: drill, corn binder, mower, disc, wagon, truck, feed grinder, hay rack, hog feeder, used tractor, grain combine, 15–30 tractor, tractor plow, press drill, gas tank, Ford car, and motors. Each of the parties was awarded possession of the property decreed to said party.

On September the 2nd, 1952, the plaintiffs instituted this action to determine adverse claims to the real property and for specific performance of the contract to sell the real and personal property, or for recovery of the money invested by them if they could not prevail on their theory of ownership. All the defendants answered separately setting up their various defenses.

After answers had been interposed by all of the parties defendant, upon motion of the attorney for the plaintiffs, leave was granted to amend the complaint and an amended complaint was served upon the parties. The order permitting the amendment of the complaint stated, "that the defendants and each of them be permitted to file such answer as each of them may see fit or stand upon their original answer." Some of the parties had answered prior to the order permitting amendment. The defendant, John O. Lyngstad, Commissioner of the Board of University and School Lands of the State of North Dakota, served a separate answer to the amended complaint and David Gunsch served a separate answer to the amended complaint. The other parties stood on the original answers served. The district court held for the defendants. The plaintiffs appealed and demanded a trial de novo.

The defendant Tony Gunsch answered and counterclaimed setting up his equitable ownership of the real property involved in the action under his contract with his father, David Gunsch, and under the contract with the State; and also asserted his ownership of the personal property and the cattle. He counterclaimed for damages for the possession of the land, conversion and appropriation of the crops and for the conversion and appropriation of the personal property, except fourteen cows and one bull. Leona Gunsch answered and counterclaimed asserting her interest in the "section" awarded to her in the divorce action. She asked for one-fourth of the crops on the "section" and cash rental value of the property in the year 1952. Arthur Bieber and Fred Bauer joined in the answer of Leona Gunsch disclaiming interest in any of the property. By separate answer to the amended complaint, John O. Lyngstad, the Commissioner of the Board of University and School Lands, set up the provisions of the contract between the School Land Department and Tony Gunsch and set forth the delinquencies therein and the cancellation thereof, and that no assignment had been consented to by the defendant as provided by the contract; that after the cancellation of the contract with Tony Gunsch the land had again been leased in the fall of 1952; that both the plaintiffs were present at the leasing thereof in Mercer County, but made no objection thereto. He asked for the dismissal of the action against him personally and as Commissioner of the Board of University and School Lands.

David Gunsch also answered and counterclaimed setting up his legal ownership to the land; the purchase thereof by Tony Gunsch and the sale thereof by Tony Gunsch to the plaintiffs. He admitted in his answer and counterclaim the allegations of the amended complaint of the plaintiffs and asked that the court determine that he was the legal owner of the "section" subject to the equitable title of the plaintiffs and that the claims of the other defendants be declared null and void except his own.

It is unnecessary to outline the contents of the amended complaint as the facts set forth and to be hereinafter discussed constitute the contentions of the plaintiffs.

## Possession of the Plaintiffs

The plaintiffs assert ownership of the interest in the "section" and "State land" of Tony Gunsch based upon oral negotiations had between Dan and John and David Gunsch, the father, and Tony. The assertion of the plaintiffs of an interest in the real property and the personal property is not evidenced by any written document, except a bill of sale given by Tony Gunsch to Dan Gunsch covering a Massey-Harris combine. The plaintiffs claim that Tony agreed to sell and assign his interest in the "section" and the "State land" and the machinery and cattle to them for $7,000, that out of this sum they were to assume and pay indebtedness due David Gunsch amounting to $2,000. The sole evidence of this asserted $2,000 indebtedness is a statement signed by Dan and John Gunsch and is dated March 15, 1951, in which they state, "John and Dan agree to pay our Father David Gunsch what Tony owes Father. Besides what Tony owes Father on the Land he bought from Father. We figure what Tony owes Father is about $2,-000 (Signed) Dan Gunsch John Gunsch." Negotiations for the alleged purchase from Tony of his real and personal property took place at the home of David Gunsch in Mandan. It is asserted all four were present. Tony denies being in Mandan on March 15, 1951. The statement of the $2,000 debt assumption by Dan and John is at best a self-serving declaration. If Tony was present it is significant that his signature does not appear on the statement of Dan and John. Failure to procure his signature gives some credence to his contention that he was not present.

The testimony further bears out that $2,000 indebtedness was not paid to the father by Dan and John by the time of the trial of this action in July 1953. Tony admits that he owes his father a note of $730 which is in evidence.

To attempt to further substantiate the negotiations as an agreement of purchase and sale the plaintiffs testified and produced witnesses indicating that after Tony's wife left him in February of 1951, he made statements that he had sold his real and personal property to his brothers Dan and John. This testimony, however, comes from Dan and John and persons who really knew nothing about the alleged transaction, and testified to alleged statements made by Tony, but not disclosed to anyone outside of Dan and John.

After the divorce action was commenced Tony left the vicinity. The plaintiffs took possession of his machinery, livestock and the land. It is undisputed that the plaintiffs did not seed the land in 1951. There is no evidence in the record indicating that they obtained possession of either the real or personal property with Tony Gunsch's knowledge or consent except on the basis of the assertion that they had purchased his property. Tony Gunsch himself denies that he ever sold the machinery, cattle or the land to his brothers. He relates that he left in the latter part of May, 1951, and that he looked after putting in the crop that year, all except about 60 or 70 acres that was put in by Carl Neuberger and of which he was to get one-third of the crop, and that he had borrowed the seed from John Goetz; that he entered into a contract with Carl Neuberger and that he put in the land and his son did the work; that Tony Gunsch was to receive one-third of the crop; that his brothers, Dan and John, helped to seed the crop for two days with two tractors and a hired man, and that it was agreed that they were supposed to use Tony's combine to cut his crop free of charge and then they in turn could use the combine to cut their crop for the help given. On cross examination by Mr. Sperry, Tony Gunsch was asked the following question: "And you say that was with an agreement that they would harvest your crop and that they could use it? A. That's right. But they supposed to harvest my crop free of charge."

The testimony bears out the conclusion of the trial court that the plaintiffs did not ob-

tain possession of the "section" and of the "State land" with the knowledge or consent of the defendant, Tony Gunsch. The trial court saw the witnesses and heard the evidence. We agree with that conclusion. The evidence amply supports it.

The plaintiffs retained possession of the land in 1952. Tony Gunsch, however, attempted to get possession of it, by entering into a lease with Carl Neuberger, first for most of the land in the "section" and also the "State land." In a communication addressed to Tony Gunsch by Carl Neuberger, it appears that he had seen Dan Gunsch and relates that Dan said that he could not give seed wheat to Carl Neuberger and that David Gunsch said that Tony would either have to farm the land himself or that he would allow someone else to farm it and further related that David Gunsch would not let Carl Neuberger farm it. In a letter to Tony, Carl Neuberger stated: "so if we can't farm it John and Dan will farm it." Then Carl Neuberger proposed in other correspondence that he would farm the new quarter, apparently referring to the "State land," if he could not farm the rest of the land. After the last communication from Carl Neuberger to Tony Gunsch a lease was entered into between Tony Gunsch and Carl Neuberger for the rental of the NE¼ of 14–143–89, or the "State land." It is clear from the testimony that Tony Gunsch at the time of his correspondence with Carl Neuberger and the lease that he entered into, thought that he had the right of possession to the property, which would be wholly inconsistent with the claim of the plaintiffs that they had bought out his interest to both the "section" and the "State land" in March of 1951.

Prior to the lease with Carl Neuberger, Tony had received a letter from him in which he had stated, "Johny and Dan are seed on your Dad land they are working with 4 tractor." It is apparent from the testimony that Carl Neuberger had been in touch with Dan and John with reference to farming the "section" as well as the "State land" and had told them that he was making arrangements with Tony Gunsch to farm

the land and that thereupon they in force, earlier than others, went in and farmed the "section" in a hurry.

The evidence is in dispute as to whether Carl Neuberger farmed the "State land" in 1952, by virtue of a lease that he entered into with Tony Gunsch. The plaintiffs claim that he leased the land from them. However, the only written lease in the evidence for the rental of the "State land" is the one entered into by Tony Gunsch and Carl Neuberger on April 28, 1952. Carl Neuberger's version of the situation is that he farmed the "State land" for Tony Gunsch. Tony Gunsch had signed a lease dated April 15, 1952, in favor of Carl Neuberger for most of the "section" and the "State land." Carl never signed it apparently because of the correspondence with Tony previously mentioned. At any rate the lease of April 15, 1952, and the lease of April 28, 1952, both signed by Tony show his persistent endeavor to assert his right to possession of the property and his effort to exercise dominion and control thereof. His efforts are wholly consistent with his contention that he never sold his interest in the land to the plaintiffs.

Soon after Leona Gunsch acquired the "section" and the other property awarded to her in the divorce action she engaged Mr. Kees, an insurance man who lives in Beulah, to look after the rental of her property and the 1952 crop. He talked to John Gunsch about this in July of 1952. He told John Gunsch that Leona Gunsch wanted him to look after the crops and John said: " 'You better stay away from that,'—He kind of threatened me—and, well that was about the result of the conversation." This testimony is consistent with other testimony in the record which shows that the plaintiffs were going to retain possession of the land regardless of any claim of right of possession by Leona Gunsch. It will be remembered that this action was not started until after Mr. Kees had talked to John Gunsch in the summer of 1952.

Leona Gunsch entered into a lease with one Fred Flemmer dated January 22, 1953, for the rental of the "section" during the

crop season of 1953. He never operated under his lease. He told John Gunsch about his lease in February or March, 1953. He had made arrangements to farm the land by buying a tractor and hiring a man. He was asked with reference to why he did not operate under the lease: "Q. Why couldn't you? A. Well there was a lock on the gate and there was a sign up, Dan and, John and Dan Gunsch owners, and when John found out about it he came and he just told me furthermore, if I didn't want to get hurt I better stay off." Mr. Flemmer testified that John and Dan Gunsch started farming the land on April 6, 1953. He explains the operations as follows: "They just started on the west quarter I think it is section twelve (12), they just had started on the 6th and they finished that all afterwards. They put all the crop in on that quarter, they put it all in after that, on the 10th they were out there yet and they had all their equipment setting there. They come out like a cyclone and they come out with five (5) tractors didn't give anyone a chance. What chance would one deferring man have with five tractors going and a few guys with pitchforks burning thistles, why they just didn't have any chance to go there, there was no use." This testimony shows that the plaintiffs felt there was some urgency to retain possession in 1953. Mr. Flemmer wanted to avoid a fight and hence did not attempt to take possession; furthermore he had received a warning from the plaintiffs' attorney the tone of which was rather severe. This warning notified Mr. Flemmer not to make any attempt to take possession, "by force of arms or otherwise," of the "section," and concluded by stating:

"You will further take notice that the undersigned has advised the said Dan Gunsch and John Gunsch that they are the owners of said real property and entitled to the possession of it, and to use all reasonable force to protect their ownership and possession of said property, *and that they are to be the judge and the jury of how much force to use to protect their property.*

"Consequently, if you attempt to take possession of said real property, by force of arms, or otherwise, *you will be embracing the perils of your own lawlessness."* (Emphasis supplied.)

This goes to show the strenuous effort of the plaintiffs to retain possession of the property. In this connection it must be remembered that they had been notified by the attorney for Leona Gunsch that she was the owner of the "section" under the award made to her by the trial court in the divorce action. The foregoing testimony and the warning constitute a good reason for Mr. Flemmer's feeling that it was useless to attempt to assert his right of possession.

August Neuberger leased the "State land" from the School Land Department in the fall of 1952 after Tony's contract had been cancelled. His lease is dated January 2, 1953. Both Dan and John were present at the school land leasing sale.

August Neuberger did not get to farm the "State land" in 1953. He was asked: "Why not? A. I kind of held off, I had several letters from Murray, J. K. Murray in Bismarck, and I also was down there, and there was a sign, no trespassers on the land by order of Dan and John Gunsch. Q. And did they go upon the land and farm it this year? A. Yes. Q. And by reason of that you were unable to fulfill your contract? A. That is correct."

In connection with this testimony there were introduced warnings that had been sent to August Neuberger. The first warning was a letter addressed to him dated November 15, 1952 by the plaintiffs' attorney in which he advised August Neuberger that the plaintiffs were the equitable owners of the NE¼ of Section 14–143–89, the "State land" and that there was an action pending between them and Tony Gunsch and the State Land Department and others for the purpose of quieting title to the property and warning him not to attempt to take possession of the land. The warning

read: "I have advised my clients to use all reasonable physical force to evict any trespassers, including you, from this land. Consequently, I warn you to keep off from this land; if you attempt to take possession of the same, *you are liable to get hurt.*" (Emphasis supplied.) This warning was subsequently followed by another sent by registered mail to August Neuberger and dated March 28, 1953. It is identical in form and content to the notice sent to Mr. Flemmer except for the description of the property, and warns August Neuberger not to attempt to take possession. Mr. Neuberger was in the office of the plaintiffs' attorney along about March 28, 1953, Dan and John Gunsch were present as well as Carl Neuberger. At the conference there was conversation concerning the rental of the "State land." August Neuberger knew that Carl Neuberger had been asked to lease the "State land" by Dan and John Gunsch. August Neuberger at that time had a lease on the land so he told his brother Carl to do nothing about leasing the land. It developed at the conference in Mr. Murray's office that Mr. Murray informed August Neuberger that John and Dan were going to lease the land as legal owners, and Mr. August Neuberger in the presence of John and Dan and Carl Neuberger told Mr. Murray that he would not stay off the land. There was considerable conversation about this matter and Mr. Murray finally told him that he would advise his clients to use force to keep him off if he should enter and take possession of the land. There was even some mention of shooting. This testimony shows the extent to which the plaintiffs would go to retain possession of the land.

It appears that in April of 1953 a restraining order had been issued against John and Dan Gunsch which enjoined and restrained the plaintiffs from trespassing on the "section." In a return to the injunction and contempt proceedings in the case of State of North Dakota v. Dan and John Gunsch, there is attached a copy of a lease signed by Dan and John Gunsch on the 28th of March, 1953, with Carl Neuberger, the date of the conference testified to by August Neuberger.

Carl Neuberger corroborates the testimony of August with reference to the conversation had on March 28, 1953, when he signed the lease with reference to the "State land" with Dan and John. He reiterated that there was talk of shooting and that he signed the contract after that talk had taken place. Thus the plaintiffs by lease with Carl Neuberger prevented August from exercising his rights under his lease with the State.

The plaintiffs exhibited a determined effort to retain possession of the land. There is no question that the plaintiffs used threats and coercion to retain possession thereof.

A receiver was appointed in July of 1953.

### The Alleged Agreement

There are a great number of facts involved in this action which show that there was no meeting of the minds of Tony Gunsch and the plaintiffs. No written memorandum evidencing the alleged agreement exists. The personal property that the plaintiffs claim they purchased from Tony Gunsch was not listed by them, or either of them, with the assessor or assessed to them for the years 1951 and 1952. The plaintiffs did not pay taxes on the "section" for 1952 nor insure the buildings. David Gunsch paid the taxes on the "section" for the year 1952 sometime shortly before March 2nd, 1953. In dealing with Arthur Bieber and Fred Bauer for the care of the cattle, according to the testimony of these men, neither one of the plaintiffs mentioned to them that they had purchased Tony Gunsch's interest in the land sold him by his father, or the "State land." They referred to the cattle as "Tony's." In dealing with Art Zimmerman, the banker, it was his understanding that they were arranging for the sale of "Tony's cattle." Although both of the plaintiffs were present at two hearings involving aspects of the divorce case

between Leona Gunsch and Tony Gunsch, neither one of them ever mentioned at either hearing held in July, 1951, and October, 1951, that they had purchased the land and the personal property from Tony Gunsch. They knew or must have known of the restraining order issued in the divorce action. They had never mentioned the transaction or alleged deal to anyone except their attorney and some friends who had no interest in the matter.

At the time of the trial of the divorce action of Leona Gunsch v. Tony Gunsch, David Gunsch, Tony's father, was called as a witness. He stated he was present at the time of the alleged transaction between the plaintiffs and Tony Gunsch on March 15, 1951, as the parties met in his home at Mandan. He apparently participated in their discussions. He testified: "Q. And you have brought an action against your son, Tony Gunsch, to cancel this contract, have you not? A. Yes. Q. Have you been able to get service upon him in this action? A. Not yet. Q. Your attorneys have drawn the papers for that and as soon as you can get service, you are going to have the action commenced, is that right? A. That's right. Q. And that is because he has left the land and has not been operating it and because of his neglect of the buildings and other matters, is that it? A. He never was on my place since the day he bought it." If as contended there had been a sale of Tony Gunsch's interest in the "section" on March 15, 1951, there was no basis for the cancellation of the contract as to him. The plaintiffs had assumed his obligation and were the alleged owners of the contract. If the alleged agreement had been consummated, as contended, then there was no basis for the contention that he had abandoned the premises. This testimony of David Gunsch is wholly inconsistent with the claim that the plaintiffs had purchased Tony Gunsch's interest in the "section." John Gunsch was present on an occasion when Tony had a conference with Mr. Kelsch concerning the divorce action and at that time he did not mention the purchase of the land or the cattle to Mr. Kelsch. Dan admitted

that neither he nor John told anyone that they claimed the cattle or that they bought them until after the divorce case had been tried and judgment therein entered.

There is testimony by both Dan and John Gunsch that at the time of the alleged transaction that Tony Gunsch handed a copy of his contract for deed with his father and a copy of the contract with the State of North Dakota for the purchase of the "State land" to Dan, March 15, 1951. There is also testimony in the record that after the alleged transaction in March 1951, signs were erected on the land to apprise anyone that Dan and John were the owners thereof. Assuming, as contended, that copies of the contract with David Gunsch and the State of North Dakota were handed to one of the plaintiffs at the time of the alleged transaction, that fact when taken into consideration with all the other evidence in the record does not establish that the plaintiffs and Tony Gunsch reached an agreement of purchase and sale as to the property involved in the action.

No proper assignment of the "State land" contract was ever obtained or certified copy thereof nor was the alleged assignment ever approved by the Board of University and School Lands or any of its duly constituted officers. It is also plain that the $4,100 paid to David Gunsch from the proceeds of the 1951 crop was paid on the condition that proper conveyances were to be had from Tony Gunsch. The same is true of the $1,500 paid out of the 1952 crop. The payment of these sums on condition of obtaining a proper conveyance of the property is an admission by the parties that a completed deal was never consummated.

The alleged transaction was never considered complete or fully concluded. David Gunsch testified as follows: "Q. Mr. Gunsch, after you had this talk at your house on March 15, 1951, with John and Dan and Tony, did you consider John and Dan the owners of that land, the section that you sold to Tony? A. Just as soon as Tony sign the deed, yes. Q. You

didn't consider the deal as completed then, until the deed was signed, is that right? A. Yes. Q. And that deed was never signed? A. No." He was also asked: "Q. You expected Dan and John to pay the chattel mortgage, did you not, or the amount of that note? A. Well, if they got the deed then they pay it." Whatever negotiations were had between the parties it is apparent from the testimony above quoted that the deal was never to be considered as complete until there was a deed signed by Tony Gunsch or some other written documentary evidence showing the transfer of his interest in the contracts which were the subject matter of the real estate part of the transaction. The testimony of both plaintiffs also indicates that. That would harmonize with the provisions of the contracts themselves, which are exhibits 1 and 3 in the evidence, as neither could be assigned without the consent of the first party and with reference to exhibit 3, the contract between the State of North Dakota and Tony Gunsch, it was necessary that the assignment be accepted and approved by the Board of University and School Lands before it would be binding on it. The version of David Gunsch that there was never a completed deal between the parties is amply substantiated by the actions, testimony, and conduct of both Dan and John Gunsch.

John Koenig, the elevator manager of the Peavey Elevator Company at Zap, testified with reference to the storage by the plaintiffs of 1494 bushels net of grain at his elevator. It was sold on June 28, 1952, at $2.00 a bushel. It had been contended by the plaintiffs that this grain was stored in Tony Gunsch's name and that he was to receive the proceeds from it if he signed a deed of the land, but the witness did not remember any such condition. But the fact that the plaintiffs so contended is further evidence that they did not consider that a deal had been fully consummated between them and their brother, Tony Gunsch.

Although urgent requests and appeals were made to Tony Gunsch to sign some papers, a deed, or other writing he never did. He persisted in his refusal to do so. He had been restrained from transferring his property and the plaintiffs must have had knowledge thereof. Tony Gunsch further persisted in leasing or attempting to lease the land to others than his brothers in 1951 and 1952. All this testimony is impressive. It indicates that there never was a complete understanding between the parties.

Now let us attempt to ascertain the terms of the alleged agreement. The plaintiffs and David Gunsch all testify that Tony Gunsch had agreed to sell his interest in the "section," and the "State land" and the machinery and the cattle heretofore mentioned for $7,000. They also admitted that as a part of the $7,000, and to be deducted therefrom, the plaintiffs would pay to David Gunsch the sum of $2,000; no part of this $2,000, however, had been paid by the plaintiffs, or either of them, to David Gunsch at the time of the trial of this action in July of 1953, which is indicative of the fact that the plaintiffs were not certain as to the actual terms of the agreement themselves, or that a completed deal existed.

David Gunsch had taken a chattel mortgage from Tony Gunsch to cover $4,000 which was a part of the consideration for the purchase of the land by Tony from him in February of 1951. There is considerable confusion in the testimony as to whether or not the $4,000 was a part of the $7,000 or whether the payment of the $4,000 was in addition thereto. It is difficult, if not impossible, from the testimony and the record to ascertain clearly what the situation was in that connection. To show the confusion in the testimony and as an indication that the parties never did get together on any completed definite transaction involving the property, we quote some testimony of John Gunsch: "Q. Then you knew that this seven thousand ($7,000) dollars would have to be applied upon the mortgage that your dad had, did you not, of four thousand ($4,000) dollars? A. We were to pay up that mortgage of Dad's. Q. In addition to the seven thousand ($7,000) dollars you claim, is that what

you mean? A. If our deal would have been through with that land and that Tony would have delivered up those papers and that note to be cancelled, we would have paid up that four thousand ($4,000) dollar note. Q. Anyhow, you figured Tony was going to have seven thousand ($7,000) dollars and his young stock after you had bought all of the rest of the property from him, is that right? A. That is right." There is no testimony to the effect that the plaintiffs pay the $4,000 in addition to the $7,000. From this testimony it would appear, although it is not entirely clear, that the alleged agreement included payment of $4,000 out of the $7,000. If that is not a proper inference, then the $2,000 that the witnesses said they (Dan and John) were to pay to the father, David Gunsch, and the $4,000 and the other debts would leave very little for Tony. No definite time of payment as to the $7,000 was provided, and the testimony shows according to the contention of Dan, John and David Gunsch "that Tony was to get it until fall as he' wanted." To further show the nature of the transaction we again quote from the testimony of John Gunsch: "Q. In what way were you to pay that seven thousand ($7,000) dollars? A. To Tony? Mr. Sperry: That's right. A. That was in the condition, what he owes dad and what he owes me to go off the seven thousand ($7,000) dollars. Q. Isn't that what I just asked you, if that two thousand ($2,000) dollars was to come out of that seven thousand ($7,000) dollars? Isn't that right? A. You mean Dad's two thousand ($2,000) dollars? Mr. Sperry: That's right. A. Oh, you said the two thousand ($2,000) dollars comes off of the four thousand ($4,000) dollars? Mr. Murray: That's what you did say the first time. Q. Alright, out of this seven thousand ($7,000) dollars then, that you and Dan were to pay Tony, the two thousand ($2,000) dollars that you say he owed to your Dad was to be taken out, is that right? A. Yes." This testimony does not, however, definitely disclose whether or not the $4,000 payment to David Gunsch was to be deducted from the $7,-000 consideration to go to Tony. The de-duction of the $2,000 from the $7,000 would leave $5,000 still due, and the further deduction of $4,000 would leave only $1,000 for Tony. If the checks offered in evidence were actually payments on the alleged transaction, then the plaintiffs paid much more than they say they agreed to pay for Tony's property. Discussion between the attorneys for the plaintiffs and Leona Gunsch lends further support to the confusion as to the application of the $4,000. Apparently on the basis of the testimony received they did not understand the situation fully.

Several checks had been presented by John Gunsch to show alleged payments on the transaction. The first check was dated December 15, 1948, for $255 and is given by John Gunsch to Tony Gunsch, which John claimed that he owed him. This check antedates the alleged agreement and certainly was not a payment on the alleged contract. The total of all the checks and receipts presented by John Gunsch as evidence of payment on the alleged transaction with Tony amounted to $1,417.24. Several checks had been presented by Dan Gunsch as alleged payments on the transaction with Tony. They totalled $1,592.44. The testimony shows that approximately $3,000 worth of grain had been deposited in an elevator at Zap to be delivered to Tony when he signed papers in connection with the alleged transaction. If these were proper payments on the alleged transaction, then the parties had over-paid Tony by several thousand. It is hardly conceivable that they would do that. Another peculiar fact exists, why should these parties in a joint transaction pay portions of the purchase price to Tony Gunsch separately and apparently without contact with each other? Tony explains that the checks which the plaintiffs assert evidence payments on the contract were given to him for money that he had left with his brothers for safekeeping and the record seems to confirm that. Tony claims that John and Dan took 400 bushels of wheat in the fall of 1951 and that some of the checks offered in evidence by the

plaintiffs as payment on the alleged agreement to purchase the land and the personal property from Tony were merely repayment of the proceeds from the 400 bushels of wheat that Dan and John took. He also contends that the proceeds obtained from the sale of five head of livestock in the summer of 1951 were given to Dan Gunsch and that the three payments of $125 each represented by checks given by Dan Gunsch to Tony Gunsch were repayments to him of the money received for the livestock. This seems credible for the reason that the livestock were sold on July 13th, 1951; that month Tony was involved in a hearing on the divorce case in that connection. The payments of $125 each are dated July 27, 1951, to Tony Gunsch; then a payment made to Milton K. Higgins on August 11, 1951, for $125; and another check of $125, dated September 13, 1951, to Milton K. Higgins. At that time Milton K. Higgins was acting as Tony Gunsch's attorney in the divorce case. Tony also claims that the payment for the combine made by Dan Gunsch on October 30, 1951, was made from the proceeds of the 400 bushels of wheat and the sale of the cattle. The temporary maintenance order required Tony Gunsch to pay the plaintiff (Leona Gunsch) $200 on the 15th of April and $125 on the 15th of May, 1951, and $125 upon the 15th of each and every month thereafter until further order of the court, and it is reasonable to suppose that the three $125 checks, one to Tony himself and two to his attorney were obtained from Dan for that purpose and the evidence so indicates. Two of the $125 checks bear the endorsement of Leona Gunsch. The trial court accepted the testimony of Tony Gunsch with reference to the payments represented by the checks of Dan and John Gunsch.

The following testimony of David Gunsch seems to substantiate Tony Gunsch to the effect that Tony made the arrangements to farm the land in 1951. David Gunsch was asked: "Did you arrange to have John and Dan farm this land in 1951? A. No, Tony. Q. You didn't then do that? A. Tony arrange it. Q. Tony made the arrangement? A. Yes." Why should Tony arrange for farming the land in 1951 if he had sold his interest to the plaintiffs? David's admission is proof that no agreement was reached in March 1951. Then he gave further testimony indicating that the parties did not consider the deal completed. He said: "Q. Did you arrange to have John and Dan farm it in 1952? A. Well that, Tony gave it over to them. Q. Well— A. I had nothing to do— Q. Did you consider it a completed deal before Tony gave them a deed? A. No." The following testimony of David Gunsch further substantiates that the deal was never completed between Tony and his brothers Dan and John. He was asked: "Alright, forget about the grain on the ground. What was said by you and Dan and John when you got that forty-one hundred ($4,100) dollars grain? * * * What was said when they gave you the grain? A. They said they cannot pay it, *they ain't got it deeded,* Tony wouldn't sign the deed, and I says, 'well, you got to take that wheat in, I got to have that money, it spoils here, and if Tony don't give you a deed I give you the money back.' Q. That's what you said to them? A. That's what I said, that's a fact." (Emphasis supplied.)

The attorney for the plaintiffs testified: "Q. Then you were attorney for Tony Gunsch at the same time that you were employed by John and Dan Gunsch in this litigation, is that right? A. Yes, I was attorney for Tony Gunsch with reference to his divorce lawsuit only. Q. And you did not file any pleadings in that divorce litigation, anytime, claiming that John or Dan were the owners of any of this property, did you? A. I did not file any pleadings at all because the pleadings had been filed and made by a preceding attorney. Q. And you did not change them? A. No, sir."

The above testimony is indeed significant with reference to whether or not there was a contract between the parties as contended. As will be remembered there is testimony in the record that the attorney for the plaintiffs was the only lawyer that

was informed about the alleged transaction. He was serving both as Tony's attorney and as John and Dan Gunsch's attorney for at least a part of the time when both actions were pending. If the alleged transaction had been related to the attorney for the plaintiffs, even though he was not Tony's first attorney in the divorce action, having knowledge of the alleged transaction, it is highly improbable that he would not ask to amend the pleadings in the divorce case to show that Tony had sold his interest in the "section" and the "State land" and the personal property to his brothers. This testimony carries a strong inference that the attorney for all of these parties as of January, 1952, had no knowledge of the alleged agreement concerning the land and the personal property.

In the fall of 1952 Dan and John Gunsch and Tony, Goetz and Diede were all in Mr. Murray's office. The evident purpose of the trip to his office, as disclosed by the evidence, was to attempt to get Tony to sign papers concerning the alleged transaction. Even at the urgent request of both the parties and their attorney Tony refused to sign any papers. He persisted in that refusal throughout the entire time involved in the litigation of his divorce case and of this action. The evidence shows that he attempted to exercise dominion over the real property involving both the "section" and the "State land" and also the personal property. He entered into a contract with Fred Bauer and Arthur Bieber for the care of the cattle on January 7, 1952. These actions of Tony, when coupled with his denials of any sale of either the land or the personal property, and other testimony in the record, indicate that he never entered into any sale agreement, oral or otherwise, with his brothers, Dan and John.

Dan Gunsch admitted that there was a gas bill of four or five hundred dollars and that he and John Gunsch had asked the gas man to deliver the gas and that they used it, and then when asked to explain why it was not paid, he said: "Well, with all this mix-up here, we was going to wait until everything is straightened out." This

bit of testimony further substantiates the fact that both Dan and John understood that there was no completed oral agreement concerning the sale of the property of Tony Gunsch to them.

Perhaps the strongest piece of evidence presented in this case with reference to whether or not an oral agreement was entered into by Tony Gunsch with Dan and John Gunsch on March 15, 1951, is contained in a letter dated June the 9th, 1952, written by the attorney for the plaintiffs to David Gunsch. In that letter it is stated: "If your boy (can have reference only to Tony) holds any real estate, he had better deed it to you, and you make that deed of record. This will have a tendency to prevent his wife from hogging the whole thing. The same is true of any personal property he owns, he should give a bill of sale to someone." As of June 9, 1952, apparently the attorney for the plaintiffs had no knowledge of any alleged oral agreement between Tony Gunsch and Dan and John Gunsch for the purchase of the land and the personal property, yet Dan and John Gunsch employed him in October of 1951. He was the only attorney to whom the plaintiffs told the details of the alleged transaction. The letter of June 9th, 1952 to David Gunsch is convincing evidence that no agreement was reached on or about March 15, 1951. Here more than a year and approximately three months after the alleged transaction the attorney for the plaintiffs writes to David Gunsch urging that Tony Gunsch dispose of his land and his personal property in order that his wife may not get ahold of it. This letter gives further credence to the testimony of Tony Gunsch that he never sold any of his property to his brothers and explains his persistent refusal to enter into any sale thereof by signing of any papers, and further fortifies and strengthens his attempted dominion over the property.

Tony in connection with his persistent refusal to sign the property over to the plaintiffs testified with reference to a payment of $10 given to him by his brothers shortly before the trial of this action as follows:

"Q. Did they try another time, Tony, to get you to sign your property over to John and Dan so that your wife or Sperry wouldn't get it? A. They tried here last court term we had.

"Q. And that was on June 10, 1951 (1952), isn't that right? A. Whatever that date was, I can't remember the date, but whenever it was.

"Q. That's the time John gave you ten ($10) dollars, is that right? A. That's right.

"Q. And they wanted you to sign more papers then? A. He gave me the ten ($10) dollars, I was ready to leave and I drove here along with Mr. Lyngstag here, they wanted me to stay and I told them it costs me so much money staying over, they wanted to talk to me, well they said they will pay me if I stay over, then, they wanted to talk to me, then they gave me ten ($10) dollars to stay over.

"Q. Then you didn't promise, at that time, that you would give them a deed or any paper to show you had sold them your property? A. Not under the circumstances they wanted me to sign.

"Q. Now John and Dan were after you a good many times to get you to sign your property over to them, so that your wife wouldn't get any of it in the divorce case? A. I don't know, *is it my wife or me who they want to get it. I didn't turn it over, anyway."* (Emphasis supplied.)

Another bit of evidence that further indicates that no transaction was ever completed between the parties is shown by the fact that on July 20th, 1951, Tony Gunsch sold $634.97 worth of grain at the Beulah Farmers Elevator Company in the name of David Gunsch and turned this check over to him. David claims that as soon as the check was cashed he gave the money back to Tony. When asked on cross examination: "But you claim he owed you about two thousand ($2,000) dollars at that time? A. That's right. Q. But you didn't try to get any of that out of this check, did you? (no answer)." David Gunsch also advanced $80 to Tony June 4, 1951, and $300 August 1, 1951. It seems strange that if David Gunsch had $2,000. coming from Tony that he would give him all of the money realized from this check, and make these advances.

We deem it unnecessary to detail cumulative evidence supporting the conclusion herein reached. Many of the facts could be set forth. Suffice it to say that they further support the conclusion that there never was a complete meeting of the minds, or an oral contract, between the plaintiffs and Tony Gunsch.

The evidence is voluminous, often conflicting, contradictory and even confusing. When the evidence is considered as a whole it does not spell out a clear cut agreement between the parties. If any negotiations took place it appears that whatever talks there were between the plaintiffs and Tony and their father, David Gunsch, their primary purpose was to attempt to keep Leona Gunsch from procuring an interest in Tony's property; but the negotiations whatever they were, never amounted to an oral agreement between the parties.

The divorce action was started March 10, 1951. The papers were served March 13, 1951. The alleged oral agreement is supposed to have been consummated on March 15, 1951. These facts and other facts in the record indicate some endeavor by the plaintiffs, and perhaps Tony, to make it difficult for Leona Gunsch to procure an interest in Tony Gunsch's property by virtue of her divorce action. The plaintiffs knew of the restraining order issued at the time of the commencement of the divorce action against Tony. They were present at hearings involving Tony's alleged violation of the restraining order. Neither one of them at any time asserted ownership of the property until the divorce action had been completed. It is hardly credible that the plaintiffs would not have asserted ownership of the property at these hearings if they had purchased it. David Gunsch testified in the divorce action. It

is difficult to believe that as a participant in the alleged negotiations and the owner of the "section" he would not have disclosed the sale of the land and of the other property by Tony to the plaintiffs if an agreement to that effect had been consummated as of the time of the divorce trial. His appearance as a witness in that trial was the opportune and logical time to disclose the alleged sale by Tony of his property to the plaintiffs. *He did not do so.* This failure is a persuasive fact to indicate that no agreement had been reached in March of 1951.

█ On October 13, 1951, Dan Gunsch gave Tony Gunsch a check for $400. It contains a notation in the left-hand corner: "NE–14 S½ and NE–13 S½ of SE and S½ of SW 2(12) 143–89 Price $7000.00". There is no method by which it can be ascertained whether this notation was on the check when delivered to Tony Gunsch. The notation is somewhat less distinct than the other parts of the check, although it may have been written with the same pencil. But Tony Gunsch says this notation was not on the check when it was delivered to him. The inference of the notation is that it is a memorandum of the alleged transaction between the plaintiffs and Tony Gunsch. Assuming that the notation was on the check when it was delivered to Tony Gunsch, is it a sufficient memorandum of the alleged agreement? It does not name the parties to the alleged agreement nor the date thereof; nor the personal property alleged to have been purchased by the plaintiffs from the defendant, Tony Gunsch; nor is the time of the payment of the $7,000 set forth; nor that the check constituted a part payment of the purchase price of the land and the personal property; nor is the check signed by but one of the alleged purchasers. At best it is a fragmentary notation of some of the possible terms of the alleged agreement. It does not sufficiently disclose the terms and conditions of the contract. Even under the rule announced in the case of Goetz v. Hubbell, 66 N.D. 491, 266 N.W. 836, the notation is not a sufficient memorandum of the alleged agreement.

On January the 4th, 1952, John Gunsch gave to Tony Gunsch a check for $150. It contains a notation in the left-hand corner: "For all Tony Gunsch land in sections 12–13–14–143–89." Tony Gunsch denies that this notation was on the check when he received it and John Gunsch admits that it was put on sometime after the check was written but before it was delivered to Tony. It, however, is wholly insufficient as a memorandum of the alleged agreement.

█ The trial court saw all the witnesses and heard the testimony and after a very careful consideration and analysis of the evidence came to the conclusion that there was no meeting of the minds of the plaintiffs and Tony Gunsch. He stated his conclusion as follows: "It is clear then that there was no meeting of the minds of the plaintiffs and Tony Gunsch and hence it necessarily follows that there was no contract." We agree with this conclusion of the trial court. It is amply supported by the testimony and the entire record.

█ This court has held any number of times that where a case is brought to the Supreme Court for trial de novo, the findings of the trial court are given appreciable weight although they are not clothed with the same presumption of correctness as would be true in other cases. Braaten v. Grabinski, 77 N.D. 422, 43 N.W.2d 381; Ellison v. Ellison, N.D., 54 N.W.2d 656; Braaten v. Brenna, N.D., 63 N.W.2d 302.

The most favorable interpretation of the evidence to the plaintiffs leads us to the inevitable conclusion that even they, by their own actions and testimony indicated that no contract ever existed between them and Tony Gunsch for the purchase of Tony's land, livestock, and machinery.

In view of our determination that the parties had no complete understanding and that no oral contract for the purchase of the land and personal property of Tony Gunsch existed, it becomes unnecessary to determine whether the contract comes

within the statute of frauds or was partly or sufficiently performed to take it out of the statute of frauds, or that it was fraudulent as to Leona Gunsch.

It is contended by the plaintiffs that if they are not granted judgment quieting title to the real property and that the defendant Tony Gunsch is not required to specifically perform the contract involving the real and personal property, this court should award judgment requiring that the amount the plaintiffs have paid on the purchase price or invested in the property be deposited in court for their benefit.

■ The plaintiffs obtained possession of the property without the knowledge and consent of Tony Gunsch; retained possession in 1952 and 1953 by coercion and threats. Their possession of the land, both the "section" and the "State land" was illegal and they are, and have been trespassers upon the property. A "party, who enters upon land as a trespasser and sows crops thereon, acquires no title or interest in such crops." Syllabus 6, Stone v. Bartsch, 76 N.D. 721, 39 N.W.2d 1; Wadge v. Kittleson, 12 N.D. 452, 462, 97 N.W. 856. The plaintiffs had no agreement on which to base their continued and forced possession of the land. There is nothing in the record to show that they acted in good faith. Lawless attempts to control another's rightful possession of property should not be rewarded by giving one the fruits of a trespass made in bad faith. The plaintiffs acted at their peril. In the Wadge case, supra, it is said:

"The plaintiff had the same right to the land in 1902 as he had in 1900 and in 1901. Because the defendant, without license and by threatened force, cropped the land in 1902, does not give him any legal right to the crop. He acted without right or authority and at his peril, and must suffer the consequences. The crops belong to the owner of the land, unless some right thereto is given to a tenant or cropper by authority or assent of the owner." 97 N.W. at page 859.

The plaintiffs are, therefore, not entitled to recover for any investment that they have made during the time that they were in the possession of the land of Tony Gunsch.

David Gunsch both in his answer and in his testimony has asserted that the $4,100 paid out of the 1951 crop to him under the contract that he entered into with Tony Gunsch for the purchase of the "section" and the $1,500 paid to him out of the 1952 crop must be paid back to John and Dan Gunsch. Since John and Dan Gunsch never had a contract for purchase of the "section" or the "State land," the payments made out of the crop in 1951 and 1952 either belonged to Tony for payment to David Gunsch, or inure to the benefit of Leona Gunsch. David Gunsch was entitled to this money as a part of the crop that should have been delivered to him under his contract with Tony Gunsch. If he pays this back to the plaintiffs, they must account for it to Leona Gunsch. When the court awarded the "section" to Leona Gunsch in the divorce action these payments on the contract inured to her benefit and were within the terms of the divorce judgment and decree and should be credited thereon.

On August 28, 1952, Tony was in default on payments required under the contract for sale of the "State land." On that date the Board of University and School Lands under the authority of NDRC 1943, 15–0812, cancelled the contract in compliance with the statute and sent the notice of cancellation required thereby to Tony Gunsch on September 10, 1952, and on the same date notified the County Auditor of Mercer County.

■ It is contended that the cancellation is invalid and that the statute authorizing it is unconstitutional. Since the plaintiffs never had a contract for the purchase of the interest of Tony Gunsch in the "State land" they are not in a position to raise the issue of the unconstitutionality of the statute authorizing this method of cancellation of the contract between Tony

Gunsch and the Board of University and School Lands. They have no interest in the subject of the statute and have not been injuriously affected thereby.

One who is not interested in the subject of a statute, and is not injuriously affected thereby, cannot attack its provisions. State ex rel. McClory v. Donovan, 10 N.D. 203, 86 N.W. 709. For many other cases that have decided this principle see 4 Dakota Digest, Constitutional Law. ⚖42, page 198.

A litigant can question a statute's validity only when and so far as it is being or is about to be applied to his disadvantage. Red River Valley National Bank v. Craig, 181 U.S. 548, 21 S.Ct. 703, 45 L.Ed. 994; Minot Special School District No. 1 v. Olsness, 53 N.D. 683, 208 N.W. 968, 45 A.L.R. 1337; Anderson v. Byrne, 62 N.D. 218, 242 N.W. 687. See also State ex rel. Johnson v. Baker, 74 N.D. 244, 21 N.W.2d 355.

The defendant Tony Gunsch set up in his answer and counter-claim a request for damages by reason of the wilful trespass of the plaintiffs and appropriation of his crops. He acted as his own attorney. There are no facts in the record which enable this court to determine what damages, if any, he would be entitled to receive by reason of the trespass of the plaintiffs. The trial court awarded him $276 for pasturage on the "section" for the period that he owned it in 1952 and $880 for crop from the "State land," which was awarded to him in the divorce case.

David Gunsch received $4,100 from the "section" as his share of the crop. It does not appear whether this was the entire two-thirds of the crop in 1951 to which he was entitled under his contract for deed with Tony Gunsch. Assuming that it was then the one-third of the 1951 crop would amount to $2,050. Tony under the contract with his father was entitled to one-third of the crop on the "section" each year. The evidence is not satisfactory as to whether or not the one-third of the 1951 crop from the "section" has been accounted for by the plaintiffs. Tony was asked: "Q. And you claim he (referring to Dan) owes you for the 1951 crop he took off the place? A. Yes." The plaintiffs should be required to account to Tony Gunsch for one-third of the crop taken from the "section" except that portion of it which went to Carl Neuberger for his assistance in putting in the crop on the "section."

Based upon our finding that the parties never reached an agreement of sale and purchase of the property involved in this case the status of the parties and the property is as follows: (1) The plaintiffs have no interest or title to the "section" and are liable for the use and occupation thereof as determined by the trial court for pasturage and are required to make an accounting of the one-third of the crop therefrom, except such portion as went to Carl Neuberger, to Tony Gunsch; (2) Leona Gunsch is the equitable owner of the "section" as the successor in interest of Tony Gunsch pursuant to the judgment and decree granted her in the divorce action against Tony Gunsch and by which she received the interest of Tony Gunsch in the contract for deed with his father, David Gunsch, involving the "section" and she is entitled to immediate possession thereof; (3) Leona Gunsch is the owner of the personal property awarded to her by the trial court in the divorce action; (4) David Gunsch is the owner of the legal title of the "section," subject to the contract for deed with Tony to which Leona Gunsch succeeded as stated in No. 2 hereof; (5) Tony Gunsch is the owner of the machinery taken by the plaintiffs and entitled to the immediate possession thereof and the reasonable value of the use of such machinery; (6) Leona Gunsch should reimburse David Gunsch for taxes paid by him on the "section"; (7) Since the State of North Dakota cancelled its contract for sale on the "State land" purchased by Tony from it, and since the plaintiffs have no ownership on which to base their challenge to the constitutionality of the statute authorizing the method of cancellation used by the Board of University and School Lands,

the State of North Dakota retains title and possession of the "State land."

The plaintiffs object to the taxation of the costs in this as well as the other actions arising out of the same set of facts. They claim that the costs, were improperly taxed. Examination of the costs as taxed indicate that some duplication exists and that witness fees and mileage were taxed for some parties defendant. The attorney for the defendant Leona Gunsch states that the costs have not been retaxed.

■ Costs are purely the creature of statute and an allowance therefor cannot be made unless authorized by statute. Wallace v. North Dakota Workmen's Compensation Bureau, 70 N.D. 193, 293 N.W. 192; Thorvaldson-Johnson Company v. Cochran, 64 N.D. 367, 252 N.W. 268.

"Compensation and Mileage of Witness; County to Pay Fees in Criminal Action. A witness in a civil or criminal case is entitled to receive:

"1. The sum of four dollars for *each day's attendance* before the district court or before any other court, board, or tribunal; and

"2. The sum of ten cents for *each mile actually traveled one way*.

"In all criminal cases such witness fees and mileage on the part of the state shall be paid out of the county treasury of the proper county." NDRC 1953 Supp. 31–0116. (Emphasis supplied.)

■ Our statute is silent as to whether or not a party plaintiff or defendant comes within the terms of the statute as to witness fees and mileage. The case of Wilkins v. National Union Fire Insurance Company, 48 N.D. 1295, 189 N.W. 317, however, has passed upon this point and this court has held that no witness fees may be charged for the time that a party is in attendance. In other words either a party plaintiff or defendant may not tax witness fees as such party. It would thus follow that no

mileage would be allowed a person for attendance at a trial of an action in which such person is a party.

■ The attendance of persons who were parties in other actions of similar character, and who were present in court awaiting the case in which they were interested and who testified in actions in which they were not parties are clearly entitled to witness fees for actual attendance on account of the case in which such person testifies the same as any other witness, but no more, and no fees are taxable for time in which such party is in attendance as a party plaintiff or defendant. The rule is announced as follows in 70 C.J. Sec. 81, p. 74:

"Persons who are parties in other actions of similar character and who are present in court awaiting the cases in which they are interested are entitled to witness fees for their actual attendance on account of the case in which they testify, but no more, no fees being allowed for the time they are in court on their own cases."

Wilkins v. National Union Fire Insurance Company, supra, is cited in connection with the above quotation. See also Grinnell v. Denison, 12 Wis. 402 [Reprint 448], in which it was held that a party to an action can not recover fees for his attendance and mileage as a witness therein in his own behalf. See also Case v. Price, 17 How.Prac. 348.

■ The costs taxed for witness fees for any party or mileage allowed for such party were improper. NDRC 1943, 31–0117 provides: "Duplicate Witness Fees Not Permissible. A witness who is subpoenaed in two or more cases by the same party shall be entitled to one compensation only from such party for the *same day's attendance or travel*." (Emphasis supplied.) If in the consolidated trial of the six cases a witness appeared in one or more case during any day's attendance under the above statute only one witness fee and one allowance for travel would be permissible. Upon remittitur the costs

in this and other cases that were consolidated with this case should be retaxed in conformity with the general rules herein stated.

Interests in the 1953 crop will be a matter of separate determination in the receivership action.

No satisfactory evidence exists in the record to show the amount and value of one-third of the 1951 crop on the "section" which belonged to Tony and was appropriated by the plaintiffs, nor is the same accounted for by satisfactory evidence. The trial court rendered judgment in favor of Tony Gunsch for $276 for pasturage on the "section" in 1952 and for $880 for crops on the "State land."

There is no evidence in the record to determine the value of the use of Tony Gunsch's machinery of which the plaintiffs have had possession since 1951. It is necessary that additional testimony be taken to determine these matters.

"We point out in Bartholomew v. Bartholomew, 60 N.D. 441, 235 N.W. 147, that sec. 28–2732, Rev.Code (Sec. 7846, Supp.), makes provision, in a case tried without a jury, for the retention of jurisdiction by this court when it appears additional material evidence can be furnished, so that litigation may be finally determined upon the appeal, if possible. In that event this court will remand the case to the trial court for the taking of such testimony and the making of findings thereon.

"In conformity with such rule, and as stated in Hettinger County v. Trousdale, 69 N.D. 505, 511, 288 N.W. 25, 28, this case is remanded to the district court with instructions to permit additional testimony to be presented on all issues, by both sides, after which the district court will make further findings and cause the additional record to be settled, certified and returned to the court with the record that is now remanded." Arhart v. Thompson, 75 N.D. 189, 206, 26 N.W.2d 523, 531.

 This case is remanded to the district court with instructions to permit additional testimony to be presented on the issues mentioned, by both sides, after which the district court will make further findings and cause the additional record to be settled, certified and returned to this court with the record that is now remanded for further proceedings in conformity with this opinion.

MORRIS, C. J., and GRIMSON, BURKE and SATHRE, JJ., concur.