[File No. 7040]

E. A. ARHART, Respondent, v. CLARA THOMPSON and AGNES THOMPSON, Appellants.

(26 NW2d 523)

Opinion filed March 28, 1947

*Day, Lundberg & Stokes,* for appellants.

*Burtness & Shaft,* for respondent.

BURR, J. This is an action to compel specific performance. The defendants are sisters. In order to avoid confusion we refer to them as Clara and Agnes. Both are experienced business women.

The complaint alleges: Clara is the owner of the property involved; in September 1945 she accepted plaintiff's offer to buy the same for $2350 and took his check for $100 given as earnest money; she agreed to deliver a warranty deed conveying the premises upon the payment of the remainder of the $2350; by letter received about October 3, 1945, she advised him she would not sell the premises to him and returned the check to him; he sent it back to her and she again returned it; he tendered the full purchase price; it was refused; that at all times he has been ready and willing to pay the purchase price upon delivery of the deed, but she has refused to execute the deed; about the ninth day of October, 1945, she conveyed the premises to Agnes, but the latter had full knowledge of the agreement between plaintiff and Clara; the conveyance by Clara to Agnes was executed without consideration and with fraudulent intent to deprive plaintiff of his right under the contract; the premises were rented by the defendants in a sum unknown to plaintiff. The plaintiff prays the defendants be required to convey the premises to him free and clear of any encumbrance, upon the payment of $2350 to them, and that he have judgment against the defendants for the rentals since October 1, 1945.

Clara answered denying any contract with the plaintiff although she admits that certain correspondence took place between them. As further defense she alleges inadequacy of price; "that said premises were of a value highly in excess of the con-

sideration offered by the Plaintiff;" that the contract which the plaintiff demands the defendants specifically perform is not just and reasonable; that the plaintiff made false and fraudulent representations inducing her to give assent; if consent was given, it was given under the influence of misapprehension and misunderstanding of the property and the terms; if she made an offer to sell the property no contract was fully consummated in this; that the plaintiff, in his acceptance, varied the terms of the offer, thereby constituting the same as a new offer, and not an acceptance; that on January 28, 1944, she had made, executed and delivered a warranty deed conveying said property which deed was recorded on October 9, 1945.

The plaintiff replied denying these allegations of the answer except he admits a warranty deed to Agnes was recorded as alleged.

Agnes answered alleging she is the owner of the property described and denying knowledge of any alleged contract between the plaintiff and her co-defendant.

The trial court found for the plaintiff to the effect that Clara was the owner of the premises in September 1945, subject to a mortgage to the Grand Forks Building and Loan Association; that she sold the property to the plaintiff for $2350 and agreed to deliver a warranty deed; that the plaintiff tendered the full amount as directed and has at all times been ready, willing and able to perform his obligations; that on or about October 10, 1945, Clara conveyed the premises to Agnes; that Agnes at that time had full and complete knowledge of the agreement of Clara to convey the property to the plaintiff; that the consideration for the contract between the plaintiff and Clara was adequate; that Clara's assent was not obtained by misrepresentation nor given under the influence of mistake, misapprehension or surprise; that Agnes was not a good-faith purchaser for value; that her rights were subordinate and subject to the rights of the plaintiff; and that the Building and Loan Association had a lien upon the premises amounting to $1279.59.

The trial court concluded: that the plaintiff was entitled to judgment requiring the defendants to execute and deliver to him

a good and sufficient conveyance in fee with the usual covenants of warranty upon payment of $1070.41 to defendant as the balance of the purchase price remaining due to Clara after discharging the lien of the Building and Loan Association; that plaintiff was entitled to all of the rentals accruing after September 25, 1945; that if defendants failed to execute and deliver such deed within fifteen days from the date of the notice of entry of judgment the plaintiff may pay the amount due upon the lien and pay to the defendants or their attorneys or into the court for the defendants the sum of $1070.41; upon such payment this judgment shall have the same effect and operation as a warranty deed from the defendants and the plaintiff would be the owner of the premises free of all claims of the defendants or either of them; and that if the plaintiff shall fail within three days to pay the sum due to the defendants and to the mortgagee he "shall be forever barred of his right to specific performance of said contract . . . ."

Judgment was entered accordingly and defendants appeal from the whole of the judgment on questions of law and fact and demand a retrial of the entire case.

For some time prior to 1937 Agnes was engaged in the insurance business in Grand Forks. In 1937 or 1938 she became the owner of the Pioneer Insurance Agency and was such owner at the time of trial.

In 1941 Clara purchased the property involved paying $2400 for it. For several years prior thereto she had been bookkeeper for the Building & Loan Association, connected with its loan business, and in 1942, she obtained a loan of $1600 from the Association giving it a mortgage upon the property. At the time of the negotiations this mortgage was unsatisfied.

On account of her health Clara left Grand Forks in January 1944, and has lived in California ever since. There is nothing in the record to indicate she ever returned to Grand Forks. She did not testify in this case. Agnes remained in Grand Forks.

There are but three main issues to be determined on this appeal. First, was Clara the owner of the premises at the time

the negotiations between her and the plaintiff began? Second, if so, did Clara agree to sell the premises to the plaintiff and he agree to pay for the same, so that a contract was consummated? Third, was the agreed price sufficiently adequate so as to justify the court in requiring specific performance?

The first point we consider is whether the record shows Clara was the owner of the property at the time the alleged contract was made. The trial court found that Clara conveyed the premises to Agnes on or about October 10, 1945. The evidence shows Agnes was cognizant of the agreement between Clara and the plaintiff regarding the property before then, even if she did not know all of the terms. Being a defendant herein any right she had could be litigated and declared subordinate to that of the plaintiff.

If this deed to Agnes was executed on January 28, 1944, and delivered to Agnes then, with the intent that the premises were thereafter hers and the title transferred to her, the property became hers and Clara was thereafter a stranger to the title. In that case, Clara, being no longer the owner of the property, the court is without power to order specific performance on her part. See Boyle Holding Corp. v. Medgreen Holding Corp. 154 Misc 189, 276 NYS 670; Baldo v. Ferrari, 223 App Div 494, 228 NYS 609; Chandler v. Hollingsworth, 96 Cal App 472, 274 P 581; Lowe v. Harmon, 167 Or 128, 115 P2d 297.

This subject is well treated in Pomeroy's Specific Performance 3d ed 660 et seq. Here it is shown that where the "incapacity is legal and absolute there can be no decrees; and this would be the case if the defendant had contracted to sell and convey, or lease, some specific thing which he did not own." P 663.

The theory of the defendants is that the incapacity of Clara to sell to plaintiff existed from and after January 1944. As is said in Henderson v. Jones (Tex Civ App) 227 SW 736, "Where the execution of an absolute deed antedated a contract to convey, it was beyond the power of the court to decree specific performance of the contract; ownership of the land by the

vendor at the time a suit is brought for specific performance being essential to its maintenance." In this Texas case the defendant owned land which he deeded to one Baxter and wife. About two months thereafter he contracted to sell the land to plaintiff. Plaintiff brought an action for specific performance making Jones the grantor in the deed and Baxter the grantee, parties defendant, just as is done in the case at bar. The Texas court points out that Henderson had only a contract for deed which Jones the original owner could not specifically perform, and held that the Jones' contract made with Henderson did not give the latter superior right over the Baxter deed. The court notes that if the deed to Baxter was a fraud or sham in order to enable Jones to avoid performance the situation would be different; but there was nothing in the case to show fraud.

This theory of fraud is clearly involved in the case at bar, it being the theory of the plaintiff that the deed from Clara to Agnes was a fraud and a sham, not executed in January 1944, but in October 1945, and very evidently to enable Clara to avoid performance of her contract with the plaintiff—all this on the theory that there was a contract between Clara and the plaintiff.

If the position taken by the defendants be correct, and there was this voluntary transfer of the property by Clara to Agnes in January 1944, so that Agnes became the owner of the property then the deed was not a fraud and sham. Thus, Clara could not perform her contract with the plaintiff even if she made such contract and misled plaintiff; as this would require Agnes to deed her own property to Clara or to the plaintiff. In Shankman v. Leavitt, 262 Mass 501, 160 NE 340, the court holds that specific performance will not be decreed where the ability of the vendor (in this case Clara) to perform specifically would depend upon the consent of this third party (in this case Agnes). Clara was not an Indian giver, if Agnes' testimony be correct. Agnes' title would be as good as if she had been a purchaser in good faith and for a valuable consideration. A voluntary transfer, when completed, transfers the title as effectively as if full payment was made, if transferred when and in the manner the defendants allege.

Thus, the fact, if it be a fact, that the transfer from Clara to Agnes was a voluntary transfer in the nature of a gift cannot affect the case.

If the deed was executed in January 1944, and delivered to Agnes then, so as to transfer the title of Clara to Agnes, the fact that it was not on record does not alter the situation in so far as an action in specific performance is concerned. "Transfer is an act of the parties . . . by which the title to property is conveyed from one living person to another." Section 47–0901, Rev Code. A consideration is not necessary to the validity of a voluntary transfer. Section 47–0903, Rev Code. The grant "takes effect so as to vest the interest intended to be transferred only upon its delivery by the grantor and *is presumed to have been delivered at its date.*" Section 47–0906 Rev Code. A grant cannot be delivered to the grantee conditionally. A delivery as such by the grantor to the grantee is necessarily absolute "and the instrument takes effect thereupon, discharged of any condition on which the delivery was made." Section 47–0907 Rev Code.

In Redden v. Bausch, 110 Kan 625, 629, 204 P 752, 754, it is stated, "If the vendor has no title and performance is impossible a court will not enter a decree that would be fruitless or nugatory." This rule is set forth in Kennedy v. Hazelton, 128 US 667, 32 L ed 576, 9 S Ct 202, where the court states: "A court of chancery cannot decree specific performance of an agreement to convey property which has no existence, *or to which the defendant has no title.* . . . The plaintiff must be left to any remedy that he may have to recover damages in an action at law." (Italics in this opinion ours.) The same court in the case of Halsell v. Renfrow, 202 US 287, 292, 50 L ed 1032, 1035, 26 S Ct 610, 6 Ann Cas 189, Justice Holmes speaking for the court, states: "Specific performance is impossible where the party to the contract has sold the property to one who is free from all equities." If this property was given to Agnes by voluntary transfer in January 1944, she would be free from all equities.

In Morris v. Curtin, 321 Ill 462, 466, 152 NE 210, 212, an action where the vendor had conveyed to a bona fide purchaser, the

court stated, "Since a court of equity will not make a nugatory decree, specific performance will not, as a rule, be decreed against a vendor who is unable, for want of title, to comply with his contract, even though the want of title is caused by the vendor's own act by his conveyance to a bona fide purchaser." See also Smith v. Bangham, 156 Cal 359, 368, 104 P 689, 690, 28 LRA NS 522, and Gorman v. Mercantile-Commerce Bank & T. Co. 345 Mo 1059, 1064, 137 SW2d 571, 574, where the same rule is stated.

A voluntary transfer legally executed and delivered long before the existence of an alleged contract to convey to a third person, and with no intent to defraud any one, is protected by the same rule.

Specific performance of a contract is not a matter of absolute right. It rests in the sound judicial discretion of the chancellor, and the granting or refusal of such relief must depend upon the facts and circumstances of each particular case. See Hunter v. Coe, 12 ND 505, 512, 97 NW 869. "Even when a contract is fair and honest, specific performance is not a matter of course. It rests in the sound, legal discretion of the court." Beebe v. Hanson, 40 ND 559, 169 NW 31.

Plaintiff does not claim Agnes was a party to the alleged contract with him. Plaintiff called Agnes for cross-examination and she was interrogated as follows:

"Q. You are a sister of Clara Thompson? A. Yes.

Q. Where does Clara Thompson live now? A. In San Francisco.

Q. Did she formerly live in Grand Forks? A. Yes, she did.

Q. When did she leave here? A. I think it was three years this January that she left—is it two or is it three? Let see now— I think it is three.

Q. Refreshing your memory this way, she gave you a deed to the property which is involved in this action, in January of 1944, did she not? A. Yes. Yes, that is what she did. It is two years in February or January.

Q. When she gave you that deed in January, 1944, that was just shortly before she left here? A. Yes.

Q. She also had lived here in Grand Forks for a great many years? A. Yes.

Q. She was engaged in what business? A. Clerking in the Grand Forks Building & Loan Association.

Q. She had been with the Grand Forks Building & Loan Association for ten years or more? A. Yes, I think so.

Q. Do you know what her position was there? A. Bookkeeper.
. . .

Q. At any rate she was connected in that capacity with the real estate and loan business in Grand Forks for at least ten years before she left here? A. Yes, loan business, yes. . . .

Q. Now, in January of 1944, she gave you a deed to the premises that are involved here, Lot 10, Block 14 of RePlatting of Lindsay's Addition to the City of Grand Forks? A. Yes.

Q. That deed you did not record, however, until October 9, 1945? A. No, I did not.

Q. When you received that deed from her did you pay her any consideration for it? A. No, I did not.

Q. What was the purpose of her giving you that deed, Miss Thompson? A. Well, she gave it to me to do whatever I wanted to with the house.

Q. For her or for yourself? A. Well, for myself.

Q. If you sold the house you were to keep the price? A. Yes, I was.

Q. Wasn't she to get anything out of it? A. Well, that was up to me.

Q. Your idea was she gave you the house back in 1944? A. When Clara left here she wasn't in good health. She gave me a deed to the house to do whatever I wanted to with it.

Q. And what you were to do with it, wasn't that to be for Clara's benefit rather than yours? A. No, Clara gave me the deed and said I could do whatever I wanted to do with the house. That seems strange, but it wouldn't be if you knew Clara.

Q. Did you understand she gave you the house? A. Yes. When Clara bought that house she didn't collect any rent on it for about nine months.

Q. Was your name in the deed when it was given to you? A. Yes, I think it was signed in blank.

Q. It was filled in at the time the dispute with Mr. Arhart arose? A. Yes.

Q. After she left here in January or February, 1945, did you have any correspondence with Clara with reference to this land, or this property? A. No, I don't think I did.

Q. When was the first time you knew Mr. Arhart had made arrangements to buy it? A. Well, I found out about it, and I went over and told Mr. Arhart as long as he wanted to buy the property I would give him the first chance to buy it, after he had written to Clara.

Q. Did Clara write you and tell you Mr. Arhart had made arrangements to buy it? A. No, I found out about it indirectly.

Q. Having found out that Mr. Arhart was negotiating with Clara to buy the house, you did not tell him she had given it to you?

A. No, I went over to see Mr. Arhart, and told him if he wanted to buy it I would give him first chance to buy it. I don't think I made any price to Mr. Arhart.

Q. But what I am getting at, were you not, in dealing with Mr. Arhart, acting as a representative of your sister, Clara, rather than handling your own property? A. No, I was not.

Q. You told him that you had been in—that you understood that Clara and Mr. Arhart had been in correspondence with each other about the sale of the place to Mr. Arhart? A. Well, someone told me about it, someone here in town, that Clara was selling the house.

Q. And you told Mr. Arhart that was what you had heard? A. Yes.

Q. Did you tell him you were handling it? A. Yes, I think I did.

Q. But you gave him no price, as you remember? A. No.

Q. Did you write to Clara then? A. After I found out about this I did.

Q. You did not, however, at that time tell Mr. Arhart that you

owned the place? A. Well, I don't remember whether I did or not.

Q. You cannot be sure whether you did or you did not? A. Well, I just talked to Mr. Arhart about it once. If I remember correctly that was the time I went over to him and offered it to him first.

Q. But you did not put any price on it? A. No, I did not.

Q. When then did you learn that Mr. Arhart claimed he had a completed deal with Miss Clara Thompson? A. What did you say?

Q. When did you learn Mr. Arhart claimed he had a completed deal with Clara Thompson? Did he tell you that? A. Yes, I think he did.

Q. Did you tell him she had no authority to make a deal with him? A. I think, if I remember correctly, I told him I was going to write to her, but—yes, I think that is all.

Q. And then you recorded your deed? A. Yes. . . .

Q. Do you carry the insurance on that? A. Yes, I do.

Q. Do you know how much you have it insured for? A. $1700."

When questioned by her counsel she testified:

"Q. Did your sister ever live in these premises? A. No.

Q. Was it bought for the purpose of a home, or investment purposes, or what? A. Well, she bought it for her brother's children to live in. They lived there about nine months or a year.

Q. But she had never lived in it? A. No."

On direct examination she stated that she had made an effort to sell the house, had advertised it for sale, received an offer for it and "sold it to the first man that looked at it for $3500."

This is all of the direct testimony and statements in the case dealing with the transfer of title to Agnes. Some inferences drawn from acts of both Clara and Agnes, hereinafter set out, may affect the testimony.

That there was a deed from Clara to Agnes is beyond dispute. Neither party paid much attention to this factor in the briefs upon appeal. The plaintiff in his brief dismisses the matter with this allegation in his "Statement of Facts":

"The deed given by Clara Thompson to Agnes Thompson was dated in January, 1944, and not recorded until October 9, 1945, two days after the filing of the notice of Lis Pendens, Exhibit "A," . . . ."

He follows it up by stating the deed was given without consideration, that it was given in blank and not filled in until the time of the dispute with the plaintiff in this case. The record does not show the deed was "not filled in *until* the time of the dispute." We refer to this later.

In his brief plaintiff states this also:

"Miss Agnes Thompson who claims now to be the owner and who has carried the insurance on the premises carries only $1700 insurance on this building. Miss Agnes Thompson has been the owner of the Pioneer Insurance Company for more than ten years."

Appellants in their brief, set forth what they term the "Ultimate Facts." Therein they set forth this Fact No. 2, referring to Clara:

"In January 1944, she conveyed said property to her sister, Agnes Thompson, by a deed delivered to Agnes Thompson which deed was recorded October 9, 1945."

On the trial of the case the plaintiff made no attempt to dispute the testimony given by Agnes as to securing the deed in 1944; nor did he state whether Agnes did or did not tell him she was the owner. He was quite sure he got Clara's address from Agnes, and then wrote his first letter in the series which is said to make up the contract.

The filing of the lis pendens, as was done here, is not of any importance in this case. It is not claimed by either side that Agnes was a purchaser subsequent to any contract made by Clara.

In this case we are not confronted with a situation where a vendee had his contract on record before the recordation of a prior executed deed.

If Clara transferred title to Agnes after Agnes had been told by the plaintiff that a deal had been completed between him and Clara for the purchase and sale of the land, then an action in

specific performance could be maintained against both Clara and Agnes as is sought in this case. The rule laid down in Horgan v. Russell, 24 ND 490, 140 NW 99, 43 LRA NS 1150, would apply.

If Agnes' testimony be true the transaction occurred more than a year and a half prior to any offer to buy which the plaintiff made to Clara. Standing alone such testimony shows that Clara was not the owner of the property after January 1944.

However, there are possible inferences which may be deduced from the record and may affect this testimony of Agnes.

The plaintiff is the owner of a house and lot abutting the property involved here. Some time prior to Clara's departure for California, he had conversation with her relative to purchasing this property and offered her $2200 for the place. Nothing came of this. Plaintiff's case rests upon correspondence between him and Clara and the results which flow naturally therefrom. September 6, 1945, a letter written by E. A. Arhart & Co. was addressed to Clara. Ex. B. is a copy thereof and reads as follows:

"Dear Miss Thompson:

I have been thinking about your property next door to mine on Reeves Drive and thought you might be in the mood to sell, if so the offer which I made when you were here is still good, it will be a cash deal. The only reason for me being desirous of buying is the fact that the houses are on 25 foot lots and if one or the other or both should burn, it is very doubtful if we would be permitted to rebuild on that size lot in that location. If the same person owned the 50 feet one house could be put up. I submit this for your consideration and will look for an early reply.

Yours truly,
E. A. Arhart & Co."

To this letter Clara replied with Ex. C. as follows:

Sept. 11, 1945

"Mr. E. A. Arhart,
402 Demers Ave
Grand Forks, No. Dak.

Dear Sir:

I have your letter about the house at 819 Reeves Drive. I do not recall what your offer was.

My sister Agnes, of the Pioneer Insurance Agency indicated several months ago that she might be interested in purchasing the house. However, I have heard nothing about it since so do not know if she is still interested. Also a Grand Forks real estate man wrote me a short time ago offering me $2350, net to me. I want to give you the first opportunity to buy the property if I decide to sell. Will you kindly let me know what you will pay—will you pay $2350. net to me—I would expect to pay for stamps on the deed and my share of abstract charges. There are no unpaid taxes.

I shall be glad to hear from you again if you are interested at $2350. net to me.

Yours very truly,
Clara Thompson."

Clara writes as if she were still the owner. The statement in this Ex. C. that Agnes "indicated several months ago that she might be interested in purchasing the house" suggests that Clara did not consider the deed which she had given Agnes in 1944 actually transferred title, or she had forgotten about it, or a "puffing" statement, or that no deed had been issued at that time. The trial court refers to the deed and proceeded on the theory that such deed had not been executed and delivered in January, 1944. He found it was executed and delivered in October 1945. This is an inference, there being no testimony to support that date.

This statement by Clara, set forth in Ex. C. was not made by anyone under oath, there is no intimation that Agnes knew anything about it, and the letter was introduced by the plaintiff.

Though the deed was admittedly on record at the time of trial, and the trial was held in the city of Grand Forks, neither side produced the deed or the record of the deed, so as to ascertain its date, or whether the acknowledgment thereof had been executed in Grand Forks or the date of this acknowledgment.

What Agnes meant in saying, "I think it was signed in blank" is not made clear. If that deed was executed January 28, 1944, and acknowledged and delivered before Clara left for California it would be executed in North Dakota. Such evidence as the deed itself would convey together with all evidence regarding execution, custody and other features connected therewith might be very important factors in determining whether Clara was the owner of the property at the time the alleged contract between her and the plaintiff was consummated.

Another feature developed. Agnes was asked if she told plaintiff she was handling the property, and she said, "Yes, I think I did." She was then asked, "You did not, however, at that time tell Mr. Arhart that you owned the place?" and she answered, "Well, I do not remember whether I did or not." She was then asked, "You cannot be sure whether you did or did not?" and she said, "Well, I just talked to Mr. Arhart about it once. If I remember correctly that was the time I went over to him and offered it to him first." Plaintiff testified, but was not interrogated on this matter.

A third point which could have helped, stems from the testimony regarding the insurance. Agnes was asked, "Do you carry the insurance on that?" (that is the house) and she said, "Yes, I do." "Do you know how much you have it insured for?" and she answered, "$1700." This testimony was elicited by the plaintiff. We do not know from the record whether the "you" used in these questions refers to her as owner of the property, or as owner of the Pioneer Insurance Agency. Did she mean that as the owner of the property she had it insured for $1700, or that her insurance agency issued a policy? We do not know who is the beneficiary in the policy—Clara or Agnes. This matter is not clarified.

For this court to find that the deed was not executed and de-

livered in January 1944, as the trial court found, is to hold directly that Agnes did not tell the truth under oath. On the record submitted we do not feel justified in so finding.

In so far as the defense of fraudulent misstatements is concerned the trial court was correct in rejecting it. In Ex. B. the plaintiff expresses a strong doubt as to the right of himself as owner of his own property or of Clara as the owner of the other property being permitted to rebuild in case his house should be burned. However, he merely states it is doubtful and on his examination he shows that at the time he wrote Ex. B. he was under the impression a zoning ordinance would not permit rebuilding owing to the narrowness of the lot and proximity to other houses. There is no reason for doubting his good faith in making the statement and he testified that was his opinion and he did not know the contrary until the day of the trial. There is nothing to indicate this statement had any effect whatever upon Clara in entering into a contract, if such contract was consummated.

If the fact exists that Clara was not the owner of the property after January, 1944, then this action for specific performance must fail and plaintiff be relegated to a right to recover damages. In this case he does not ask for damages as an alternative. The matter of damages is not before us. As this court is of the opinion evidence can be produced which will assist in solving the problems involved we feel that as a matter of justice and equity the case should be remanded to the trial court for further testimony.

To dispossess Agnes of the property after her unqualified statement under oath, basing it on this statement of Clara's found in Ex. C. and lack of assertion of ownership, would require us to find Agnes committed perjury. She was too intelligent a woman not to know the truth. The record shows she had been in business for many years. If the relations between the sisters be such as Agnes related, and if Clara bought the property, not so much as an investment for herself, but to aid her brother's children, there is nothing inherently improbable in

Agnes' story as to how this property was given to her by voluntary transfer.

We point out in Bartholomew v. Bartholomew, 60 ND 441, 235 NW 147, that § 28–2732 Rev Code (§ 7846 Supp) makes provision, in a case tried without a jury, for the retention of jurisdiction by this court when it appears additional material evidence can be furnished, so that litigation may be finally determined upon the appeal, if possible. In that event this court will remand the case to the trial court for the taking of such testimony and the making of findings thereon.

In conformity with such rule, and as stated in Hettinger County v. Trousdale, 69 ND 505, 511, 288 NW 25, 28, this case is remanded to the district court with instructions to permit additional testimony to be presented on all issues, by both sides, after which the district court will make further findings and cause the additional record to be settled, certified and returned to the court with the record that is now remanded.

We have not determined whether a contract exists between Clara and the plaintiff justifying a judgment in specific performance, even if Clara were the owner at the time the contract was made; nor do we pass upon the question of the inadequacy of the price. These are matters which can be determined when the question of ownership is settled definitely.

The case is remanded to the district court for further proceedings in conformity with this opinion.

CHRISTIANSON, Ch. J., and NUESSLE, BURKE and MORRIS, JJ., concur.