Bertha YOUNG, Plaintiff and Respondent,

v.

Frank L. SMITH, Defendant and Appellant.

Civ. No. 8707.

Supreme Court of North Dakota.

Aug. 31, 1971.

Rehearing Denied Nov. 16, 1971.

Ohnstad, Twichell & Breitling, West Fargo, for defendant and appellant.

Wattam, Vogel, Vogel & Peterson, Fargo, for plaintiff and respondent.

TEIGEN, Judge.

This is an appeal from a judgment adjudging a warranty deed null and void and quieting the title to the land in question in the plaintiff. The case was tried to the court without a jury and the defendant has demanded a trial de novo in this court.

The action was commenced in the district court of Barnes County to determine adverse claims to four hundred acres of farm

land located in Barnes County and a certain lot located in Valley City upon which the plaintiff's home is located. The defendant, Frank L. Smith, answered, denying generally the claims of the complaint and affirmatively alleging that he owns the property by virtue of a warranty deed executed and delivered by the plaintiff, Mrs. Young, to the defendant Smith on December 9, 1965, and praying that the action be dismissed. The plaintiff has replied, claiming that the warranty deed was obtained by false and fraudulent statements and promises and without any consideration, and that it was obtained through the exercise of undue influence. The case came on for trial and was treated by the parties and the court as an action to set aside and annul the deed on the claims of failure of consideration induced by false and fraudulent promises and representations, and the exercise of undue influence in its execution and delivery.

It appears that the plaintiff, Bertha Young, was a widow of the approximate age of eighty-five years at the time the deed was executed and delivered, and of the age of approximately eighty-eight years at the time of the trial. Her third husband died in 1958 and since about that time she had lived in her home in Valley City. Prior to that time she had lived with her respective husbands on the farm in issue here. The defendant Smith is the son of the plaintiff by her first marriage. He is her only child. There was a child born of the plaintiff's second marriage but he died in infancy. The defendant Smith was about sixty-five years of age. He is married and has five children, all of whom are grown. It appears that the property in question was acquired by Mrs. Young by purchase from her savings. Mrs. Young, in her deposition which was read at the trial, valued the farm land at about $40,000 and her home in Valley City at between $5,000 and $6,000.

Mr. Smith lived in the family home on the farm until he married in 1925. He and his wife remained in North Dakota for about a year and a half and then moved to Oklahoma in the fall of 1926. They later moved to Wichita, Kansas, where the family still resides. He was engaged in the sand, gravel and excavating business at Wichita. In about 1956 his older son took over the operation of the business. Mr. Smith is also a pipefitter. In 1956 Mr. Smith returned to North Dakota to visit his mother and stepfather and to work in the area. The farm lands have been rented to tenants on a share basis since the death of Mrs. Young's last husband in 1958. Subsequent to 1956 Mr. Smith spent considerable time in North Dakota, most of it in the Valley City vicinity. He worked on various construction jobs in Jamestown and Fargo and also did work on his mother's farm and, after the death of Mrs. Young's husband in 1958, he also did work on the home which she had purchased in Valley City. He lived part of the time with his mother, part of the time in rented quarters, and later he purchased a home in Casselton, North Dakota, which he still owns.

In 1960 Mrs. Young suffered a stroke. She had been under constant medication since that time and had been in and out of hospitals on a number of occasions. Following a series of hospitalizations in the summer of 1963, Mr. Smith placed his mother in a nursing home in Valley City for a period of three to six weeks. In the spring of 1964 he investigated the possibility of having a guardian appointed for his mother to handle her business affairs. Although he contacted several of her close friends and relatives, no one would testify that she was mentally incompetent. During this period prior to the execution and delivery of the deed, there was discussion between the mother and son pertaining to a transfer of the real property by the mother to the son. The testimony is in conflict as to the nature of these talks. However, Mrs. Young did, some days prior to December 9, 1965, go to her attorney's office to discuss the matter with him. He was her attorney of long standing, having handled various transactions for her in the past. On December 9, 1965, Mrs. Young

and Mr. Smith drove to Mrs. Young's attorney's office. Mrs. Young remained in the automobile and Mr. Smith advised the attorney that she wished to see him. The record indicates that a deed had been drawn by Mrs. Young's attorney. It is the deed in question, conveying Mrs. Young's property to Mr. Smith. It was executed by Mrs. Young at that time, in the automobile, in the presence of her attorney who witnessed and acknowledged her signature. The deed conveys the property to Mr. Smith but excepts and reserves to Mrs. Young a life estate with the full right to the use and occupation thereof, together with all rents, issues and profits from the property for aud during the remainder of her life. There is no issue as to delivery and, at the request of the parties, the deed was recorded by Mrs. Young's attorney in the office of the register of deeds of Barnes County. The execution and delivery of the deed from Mrs. Young to Mr. Smith occurred on December 9, 1965. Twenty days later, on December 29, 1965, the same attorney, as attorney for Mrs. Young, wrote a letter to Mr. Smith in which he advised him that his mother had engaged his firm to bring an action against him for fraudulently obtaining the deed unless he would immediately reconvey the land to her. In this letter he states that Mrs. Young was very upset, claiming that the deed was obtained by misrepresentation and fraud. Subsequently, there was an attempted negotiation between the attorney for Mrs. Young and an attorney employed by Mr. Smith to settle the matter. In these negotiations Mr. Smith, through his attorney, offered to reconvey the land if Mrs. Young would pay him $10,000, which, according to his attorney's letter in evidence, Mr. Smith claimed was due him from Mrs. Young for expenses incurred and moneys due for services rendered. No settlement was effected and this action was commenced by the service of a summons and complaint on June 15, 1966. We were advised at the arguments on this appeal that subsequent to the trial of this action and before argument in this court Mrs. Young passed away. It appears that although the relationship between mother and son became somewhat strained subsequent to the commencement of the action that, nevertheless, they kept in touch with each other. A letter postmarked February 16, 1967, written by Mrs. Young to her son, was introduced in evidence. It states:

"The flowers are lovely. I have them, in the TV lamp, using it as a vase. Is truly cold, here these days. Everyone is well, including myself. Mrs. Marty Marsh passed away. Have not heard from Sadie [Sadie is Mr. Smith's wife] and the families for some time. Thanks many times for the beautiful flowers.

Love
Mother"

In his testimony Mr. Smith explained that the flowers were sent to her for Mother's Day sometime earlier.

It is the contention of Mrs. Young that the deed should be set aside because it was induced by false and fraudulent promises and representations to the effect that her son would support her for the rest of her life and would pay her expenses, and that these promises and representations were not kept and that, therefore, there was a failure of consideration.

Mrs. Young testified by deposition. She did not appear at the trial. The trial court, therefore, did not have the benefit of seeing and hearing her testify in person but was required to make its findings as to her testimony based upon the cold record and was, therefore, in no better position to judge her testimony as to credibility and the weight to which it was entitled than we are.

On direct examination Mrs. Young testified, by deposition, as follows:

"Q. Did he make any promises of any kind before you deeded the land?

"A. Oh, yes, he was going to take care of me.

"Q. What did he say?

"A. 'Just deed the property to me and I will take care of you'.

"Q. Did he indicate he would provide for your needs?

"A. I think he made a statement to that effect.

"Q. Did he say how long he would do this?

"A. The rest of my life, but that life has held out a little too long.

"Q. Now, in his statements about taking care of you, did that include a housekeeper for you?

"A. Not necessarily, because I was doing my housework myself at that time.

"Q. In the event you would need that kind of care, did he _ _ _?

"A. That wasn't mentioned.

"Q. Was he going to do this looking after you without any cost to you?

"A. That's the way I understood it.

"Q. Did he indicate that he would take care of any hospital charges or medical costs?

"A. No, never, I had always paid those myself. He said, 'You have got your Social Security and other benefits for the hospital; you can take care of that yourself'.

"Q. The Deed that you signed says that it was in consideration of ten dollars. Did your son ever pay you the ten dollars?

"A. Never.

"Q. Then actually, as I understand it, the consideration actually then was in addition to this ten dollars—it was his promises to look after you and care for you the rest of your life?

"A. Yes.

\* \* \* \* \* \*

"Q. Well, after your son got the Deed to this property, then did he comply with his promises to look after or care for you?

"A. Never—he has never given me one penny in the way of support."

Mrs. Young's attorney also testified. He testified that she came to his office several days before the deed was executed. She was alone. He testified as to his conversation with her at that time. His testimony is to the effect that Mrs. Young had told him that she wished to deed her property to her son and when he asked her what consideration should be placed in the deed, she said:

"Well, Frank is going to take care of me for the rest of my life and pay all my expenses because I won't have anything left and he has agreed to do that."

Further, she told him that her son had changed his attitude toward her and she felt that he would live up to his promises. Mrs. Young's attorney testified that he had been her attorney for some time; that she had come to his office on a number of occasions and had telephoned him frequently. There is no evidence that he was ever attorney for or had been consulted by Mr. Smith. The claim of these promises is denied by Mr. Smith. He testified that he had looked after his mother's affairs and that he expected to continue to do so. There is no need shown for the promises claimed by Mrs. Young. She retained a life estate in four hundred acres of farm land, which was being farmed by tenants on a one-half share basis. The testimony indicates that most of the land is tillable and that, in the prior year, she had a pretty good income from it. She also retained the right to use and occupy her home. She testified that she had $9,000 in her bank account, and that she was receiving monthly Social Security payments and was eligible for Medicare. There is no indication from

the record that she was indebted to anyone. Furthermore, Mrs. Young, through her attorney, made a demand upon Mr. Smith for a reconveyance of the deed within twenty days after its execution. In this letter the attorney advised Mr. Smith that Mrs. Young had engaged his firm to bring an action against him "for fraudulently obtaining a deed"; that she was "very much upset about this matter and claims that the deed * * * was obtained by misrepresentation and fraud." The nature of the claim of misrepresentation and fraud is not stated in the letter. An attempt was made to negotiate a settlement, which failed, and this action was commenced about six months later.

The trial court found that, for the purpose of inducing the conveyance, Mr. Smith represented to his mother that he would provide for all her material needs, supporting her for the rest of her life without cost to her; that these false representations were relied upon by Mrs. Young and had it not been for such promises she would not have made the conveyance; and that, therefore, the consideration wholly failed.

We do not agree with the construction placed by the trial court on the testimony of Mrs. Young. In its findings the trial court has gone beyond the proof. In her deposition Mrs. Young does not explain the type of care her son was to provide. When asked the question: "Did he indicate he would provide for your needs?", she answered: "I think he made a statement to that effect." When asked whether he should provide a housekeeper, she answered: "Not necessarily, because I was doing my housework myself." Further, her testimony reveals that there was no need for him to take care of her hospital or medical costs. We note that a period of only twenty days had elapsed between the time the deed was given and the time when Mrs. Smith had a change of mind which resulted in the demand by her attorney for a reconveyance. We think the fact that Mr. and Mrs. Henry Young returned to Valley City from a visit in Oregon is pertinent to this issue. Henry Young was a brother of Mrs. Young's deceased husband. They were visiting in Oregon at the time of this transaction. For some years, Henry Young had also assisted Mrs. Young in looking after her business affairs. She had given him a power of attorney. It appears that subsequent to the execution of the deed in question Mrs. Young had changed her will to provide that her property should go to Mr. and Mrs. Henry Young and the "Jameses." Mrs. Young, the plaintiff, and Mr. James are cousins. In her deposition Mrs. Young testified that, following the return of Mr. and Mrs. Henry Young from Oregon, the matter of the execution of the deed was discussed with them about half a dozen times. She testified: "They scolded me * * * for being such a fool." It is also disclosed in the deposition of Mrs. Young that at the time the deposition was taken Mr. and Mrs. Henry Young were present. Mrs. Young testified, on cross-examination, that during this time Henry Young was sitting beside her and Amanda Young, his wife, was sitting directly behind her. The deposition does not disclose whether her son was present.

The trial court found that Mr. Smith had paid for the services of one helper for a short period of time, refusing thereafter to pay anything further. Our understanding of the record is that sometime prior to 1958 Mr. Smith had hired one Rose Brandt to keep house for Mrs. Young for a couple of months while she still lived on the farm. The questions and answers on this subject are of interest.

"Q. Do you know a Rose Brandt?

"A. Yes, she kept house for me for a couple months.

"Q. On the farm?

"A. Yes.

"Q. Who hired Rose?

"A. Frank paid her the first two months.

"Q. He hired her to come in and look after you? He paid her to do this?

"A. He didn't want to.

"Q. But did he do this?

"A. After awhile.

"Q. He paid her to come in and look after you?

"A. For two months, but he didn't want to do it.

"Q. He did it?

"A. He had to; he had hired her himself."

The answers are indicative of the attitude of Mrs. Young toward services rendered for her by her son. There is considerable testimony pertaining to what work and services Mr. Smith had rendered prior to the execution of the deed on December 9, 1965. Mr. Smith claimed that at various times when he was in North Dakota he did a considerable amount of work at the farm, at his mother's home, and in looking after her and her affairs. This claim was discounted by Mrs. Young. She testified that she had never paid her son anything for whatever services he may have rendered. When asked this question:

"Q. Have you ever paid Frank anything for the work he has done for you?"

she answered:

"A. Never, it was an understanding that he was to have the property when I was through with it."

In respect to her wills, she testified as follows:

"Q. At the time that you executed this Deed in 1961 [1965], did you have a Will?

"A. Yes.

"Q. Who were the beneficiaries?

"A. Frank.

"Q. Was he the sole beneficiary?

"A. Yes.

"Q. Do you have a Will today?

"A. No, I don't think so.

"Q. You have no Will in effect today?

"A. Not exactly like that—I have a Will.

"Q. You have a Will. Who are the beneficiaries in that Will?

"A. Do I have to answer?

"Q. Are the Youngs the beneficiaries?

"A. The Youngs and Jameses.

"Q. How frequently or how often did the Youngs talk to you about your foolish act of executing this Deed?

"A. Not many times.

"Q. Well, three, four, five or a half dozen times?

"A. I'd say a half dozen.

"Q. It was after this that you went to see Mr. Ployhar?

"A. Yes."

Mr. Ployhar was her attorney.

A considerable portion of the evidence adduced at the trial relates to work and services performed by Mr. Smith over the years. We fail to see the materiality of this evidence in this case. It appears that this line of testimony developed because, following the demand made by Mrs. Young through her attorney upon Mr. Smith for a reconveyance of the property, Mr. Smith, through his attorney, countered by offering to reconvey the property upon the payment of $10,000 to him. The demand for $10,000 was based upon a claim for services rendered for which he had not been paid. Following the service of the summons and complaint, Mr. Smith, through his attorney, answered and counterclaimed for $20,000. Of this amount $10,000 was claimed to be due for services rendered and $10,000 for damage to his reputation. However, before trial, Mr. Smith engaged

his present attorneys. The new attorneys served and filed an amended answer to the complaint in which they omitted the counterclaim. Thus the issue raised by the counterclaim was removed as an issue in this action but, nevertheless, considerable evidence pertaining to Mr. Smith's work and services was introduced in evidence. It was first injected by Mrs. Young in the deposition which was read in evidence. In respect thereto, Mr. Smith testified:

"Q. During this period between '56 and '65, 1956 and 1965, did you travel back and forth between Wichita and Valley City?

"A. Oh, yes.

"MR. VOGEL: What period are you referring to now?

"MR. BREITLING: 1956 to 1965.

"Q. (By Mr. Breitling) Now when you found it necessary to leave and travel back to Wichita when you had to leave for periods of time, did you make any arrangements to have anyone look in on your mother?

"A. Restate that again, please.

"Q. When you had to go back to Wichita, when you had to leave—

"A. Not when mother was in shape to wait on herself. The first time that we put anybody in there to take care of her was January of '66 when I had to be in Wichita for a court case.

"MR. VOGEL: January of '66?

"A. I believe that is correct.

"MR. VOGEL: By we—

"A. This deed was executed in December of '65, wasn't it?

"MR. BREITLING: Yes.

"A. It was — then it was in January of '66.

"Q. (By Mr. Breitling) Prior to that time had you arranged for housekeepers?

"A. I had one there for five days and she wouldn't take care of mother anymore.

"Q. Did you ever employ a Rose Brandt to take care of your mother?

"A. She took care of her in January when I had to go back to Wichita. We had outside help that came in. I had a little girl next door that come over and looked at mother and lots of times she got a meal from mother and did odd jobs for her.

"Q. Did you make any arrangements to have any other person look in on your mother?

"A. Yes.

"Q. Would you tell us what these arrangements were and with whom they were made?

"A. Mr. Pearson and his son Bob, and Sam Hill and his son.

"Q. What did the arrangements entail?

"A. I requested that they check with mother along and keep track so that if anything went wrong they could notify me in case she got sick or needed help they could get a hold of me.

"Q. To your knowledge did they periodically stop and look in on her?

"A. She said that they had come and seen her. I wasn't there.

"Q. Who paid Rose Brandt when she was working in your home?

"A. I paid her for two months.

"Q. Did she stay for a period longer than that?

"A. I did not.

"Q. Did Rose Brandt?

"A. Yes.

"Q. Did you ever request your mother to reimburse you for this?

"A. No.

"Q. Were you ever paid for any of the services you rendered on the farm?

"A. No.

"Q. Did you ever request your mother to pay you for any of these services?

"A. No, because she indicated to me all the time I was to get this property."

In her action Mrs. Young also contends that the deed was obtained through the exercise of undue influence. The trial court found that undue influence was exercised and that this was another reason for setting aside the deed. In its findings the trial court pointed out that Mrs. Young was 86 years of age, in a semi-weak condition, and that the defendant was her only child; that the relationship between the two was of a confidential or fiduciary nature and that the legal advice which Mrs. Young procured related solely to that of drafting the deed; that due to her weakened physical and mental condition she was easily subject to undue influence and that such influence was exerted upon her by Mr. Smith, who had the opportunity to do so; that prior to the execution of the conveyance, Mr. Smith, on many occasions, threatened to place Mrs. Young in a mental institution, accusing her of being insane, and threatened to set up a guardianship over

her property; that prior to December 9, 1965, Mr. Smith, personally and through his attorney, claimed that he would sue Mrs. Young for the sum of $10,000, representing the amount due him for work that he had allegedly performed for her; that these threats and accusations to her were desperately real and were a motivating force which resulted in the execution and delivery of the deed.

We cannot agree with these findings. Mr. Smith admits that he and his mother, on various occasions, discussed the transfer of the property to him. He also admits that there was some disagreement relative thereto. It appears that Mrs. Young wanted to give Mr. Smith a life estate in the property with the remainder to his children or, perhaps, to someone else. The record is not clear, although it is indicated that she wanted some "strings" attached and that "you might say she had the power to say what she wanted to do with it after she's gone." However, it is clear that, subsequent to these various conversations, Mr. Smith contacted an attorney who visited with Mrs. Young at her home. Following that visit, Mrs. Young went to her own attorney relative to the matter and, as a result, the deed was drawn by her own attorney, signed in his presence and her signature witnessed and acknowledged by him.

Pertaining to the finding of the trial court that Mr. Smith accused his mother of being insane and threatened to set up a guardianship of her property because of her alleged incompetency, this is admitted by Mr. Smith in his testimony. He states that he had interests in Wichita, Kansas, where his family lives, and that because of the necessity for him to make frequent trips to Wichita and to spend considerable time there on business and in family interests, he felt that someone should be in a position to legally take care of his mother's business and legal affairs in his absence. He apparently did not contact an attorney nor did he commence guardianship proceedings, but he did contact Henry Young and the

Jameses and asked them if they would be willing to sign a statement to the effect that his mother was in need of a guardian. They refused. Mrs. Henry Young and Mr. and Mrs. James testified that they believed that Mrs. Young was competent to transact her own business during this period. We believe, on the basis of the answers given to the questions asked at the time of the taking of the deposition, that Mrs. Young was competent to transact her own business and, further, that she had her own attorney upon whom she relied and with whom she consulted frequently, either personally or by telephone, relative to her legal matters. Although Mrs. Young, in her deposition, testified that she was afraid of and concerned with the threats and pressures exerted by her son to have her declared incompetent, and to sue her, this testimony, in view of the circumstances and her obvious competency and brightness of mind as indicated by her answers to questions in the deposition and her practice of consulting with her attorney frequently, is hardly believable. Mrs. Young disputed Mr. Smith's claims that he had rendered services for her for many years; however, it is clear that he spent a great deal of time in the Valley City community and at her home over a period of almost ten years, and that he was concerned with her welfare. We conclude, on the basis of the tenor of the testimony adduced by Mrs. Young in the deposition, that she was a demanding type of woman who expected his services without compensation and that, in lieu of compensation being paid at the time the services were rendered, she fully intended that her son should have all of her property upon her death, although it is probable that she may have wished to exercise some control over the property after her death. However, this deed was drawn by her attorney, after consultation with him, and there is no question in our minds but that he was more than a mere scrivener and that the limitation and exception contained in the deed truly reflects her decision at the time.

The trial court also found that Mr. Smith had made demand upon his mother for the sum of $10,000, representing work he allegedly performed for her, and that this was a motivating force in getting Mrs. Smith to execute the deed. A careful review of the record, particularly the testimony given by the two attorneys, the one who represented Mrs. Young and the one who represented Mr. Smith, clearly establishes that there was no demand made for the sum of $10,000 until after Mrs. Young's attorney had written to Mr. Smith seeking a reconveyance of the property. Therefore, this matter could not possibly have arisen until after the deed had been executed. In reference to this matter, the attorney for Mrs. Young testified, in rebuttal on cross-examination, as follows:

"I testified yesterday that I had corresponded with him before this signing of the deed and I found that I was mistaken about that."

This mistake was discovered when he went to his office files and found a copy of the letter to which he had made reference.

■ ■ Upon the basis of the facts as we find them, we cannot conclude that there was false or fraudulent representations, or a failure of consideration, or that undue influence was exercised which resulted in Mrs. Young executing and delivering the deed to Mr. Smith. We find that Mrs. Young acted freely, knowingly and with intent to convey her property to her son, retaining unto herself a life estate, and we are constrained to believe that if it had not been for the intervention of the Henry Youngs, after their return from Oregon, this action would never have been commenced.

We believe Mrs. Young stated her real reason for conveying the property to her son at the very end of her deposition, in the following questions and answers:

"Q. At the time you gave it to him you felt he should have it?

"A.  I felt he should have it.

"Q.  For work he had done?

"A.  Because he was a son."

■ We find that Mrs. Young made a voluntary transfer of her property to her son on December 9, 1965, and payment of the consideration of $10, as recited in the deed, was not necessary to its validity. Section 47–09–03, N.D.C.C.; Arhart v. Thompson, 75 N.D. 189, 26 N.W.2d 523. We believe, in view of the record in this case, that the agreement as to additional consideration was to the effect that Mr. Smith would assist his mother and care for her if she needed it, and he testified that he stood ready and willing to do so. In spite of the strong accusations made by Mrs. Young against her son, it appears to us, on the basis of the entire record, that he has been a dutiful son who has rendered considerable service to his mother and was concerned for her welfare, her comfort, and her care. We conclude that the evidence in this case will not warrant extending the strong arm of equity to protect the weaker mind against the stronger mind. In fact, from a complete study of all the evidence adduced in this case, we believe that Mrs. Young had the stronger mind of the two. The transaction is not inequitable; it is not unconscionable; and we conclude that the evidence in the case is wholly insufficient to warrant a finding of false and fraudulent promises, a failure of consideration, or the exercise of undue influence practiced by the son on his mother in procuring the execution and delivery of the deed.

The judgment of the district court will, therefore, be reversed and that court is directed to enter judgment dismissing this action.

STRUTZ, C. J., and ERICKSTAD, PAULSON, and KNUDSON, JJ., concur.

On Petition for Rehearing.

TEIGEN, Judge.

The plaintiff, who is the respondent, has filed a petition for rehearing. Most of the points set forth therein are merely a reargument of the points made in the original presentation to this court. One point, however, merits a further explanation.

In her petition the respondent states that this court failed to consider the judicial requirement that the recipient of a gratuitous transfer of property from one with whom he is in confidential relationship must show that the transfer was free from fraud and undue influence, and cites in support of this argument Johnson v. Johnson, 85 N.W.2d 211, 225 (N.D.1957). In that case this court, conceding but not deciding that there was a confidential relationship existing between the aged father and his son, found that the evidence carried the necessary burden to show that the deed was freely and voluntarily given by the father to his son and that no fraud or undue influence existed to warrant its cancellation. In *Johnson* the court cited Doyle v. Doyle, 52 N.D. 380, 202 N.W. 860 (1925). In that case a deed from a mother, who was old and feeble, was given to her son, who was in his prime. The rule was established that "where a conveyance is made and a relation of confidence and trust exists between the grantor and the grantee, if the circumstances are such that the grantor is likely to be subjected to the will of the grantee, the burden is cast upon the grantee to show that the conveyance was made freely and voluntarily and with full knowledge on the part of the grantor of its character and effect." The court determined that the question presented was principally one of fact, and found that at the time of the execution and delivery of the deed the mother had the advice of an attorney and knew what she was doing and it was not until she had talked with her daughter about the matter that she changed her mind and sought to avoid the deed. The court held that the deed should not

be set aside. Of similar import is Lee v. Lee, 70 N.D. 79, 292 N.W. 124 (1940). In that case a deed in fee simple, which was given by a mother about seven months prior to her death to two of her eight children, was upheld. The court held that the capacity to execute a deed is the capacity at the time the deed is made and the mere fact that a parent deeds property to a child does not, of itself, raise a presumption of undue influence.

In this case Mrs. Young had her attorney and Mr. Smith had his attorney. Mrs. Young consulted with her attorney on at least two occasions before the deed in question was executed. The deed does not convey fee simple title but reserves a life estate in the mother, Mrs. Young. It was not until the Henry Youngs returned from their vacation and had several conferences with the grantor that a demand was made for a reconveyance. Subsequent to the execution and delivery of the deed, Mrs. Young also changed her will whereby she willed all of her property to the Jameses and the Youngs, leaving out her only son, Mr. Smith. Her attorney was one of long-standing. She had consulted with him frequently about her business affairs. He drew the deed. He witnessed it and, as a notary public, acknowledged it. He also had it recorded. We do not concede that the record in this case establishes a confidential relationship between Mrs. Young, the grantor, and Mr. Smith, the grantee. It appears that they dealt at arm's length. Nevertheless we have determined, on the basis of the record before us, that if a confidential relationship did exist Mr. Smith has carried the necessary burden to show that the deed was freely and voluntarily made and delivered; that Mrs. Young knew what she was doing when she executed the deed; and that no fraud or undue influence existed to warrant its cancellation.

The petition for rehearing is denied.

STRUTZ, C. J., and ERICKSTAD, PAULSON, and KNUDSON, JJ., concur.